[No. A033206. First Dist., Div. Five. Dec. 8, 1986.]

Conservatorship of the Person and Estate of ELSIE SMITH.
STAN L. DIXON, as Public Guardian, etc.,
Petitioner and Respondent, v.
ELSIE SMITH, Objector and Appellant.

**COUNSEL**

Steven B. Solomon, under appointment by the Court of Appeal, for Objector and Appellant.

Robert D. Curiel, County Counsel, and William J. Losh, Jr., Deputy County Counsel, for Petitioner and Respondent.

**OPINION**

**LOW, P. J.—** ██ We hold that a proposed conservatee suffering from a mental disorder is not "gravely disabled" for the purposes of conservatorship and possible involuntary confinement, under Welfare and Institutions Code section 5350,[1] if he or she is capable of carrying out the transactions necessary for survival, including providing for food, clothing or shelter, with or without the aid of others. ██ We find the evidence is insufficient to support a gravely disabled finding, and we reverse the judgment and order of conservatorship.

I

The case raises a familiar moral and legal problem that the Legislature has sought to resolve: When should the state intervene to care for the

---

[1]All section references are to the Welfare and Institutions Code unless otherwise indicated.

nondangerous mentally ill? On the one hand, our belief in individual liberties and our faith in a tolerant society directs us to create protections against their involuntary confinement. On the other, the spectre of the helpless, incapacitated individual in need of immediate assistance, or the mentally disturbed person who creates a nuisance in our community, urges us towards making the mentally ill the wards of the state.

On September 13, 1985, the public guardian appeared before the superior court requesting that it declare appellant Elsie Smith "gravely disabled" within the meaning of section 5350 and to appoint him conservator. Temporary letters of conservatorship had previously been issued. A trial was held on Smith's request (§ 5350, subd. (d)) and the trial court found Smith to be "gravely disabled" within the meaning of sections 5008, subdivision (h), and 5350. The court appointed the public guardian as conservator for appellant for a period not to exceed one year. (§ 5361.) The conservator confined appellant to a facility that provided treatment and also authorized appellant to receive all necessary treatment.

Smith appealed from the judgment and order of conservatorship, contending (1) there was insufficient evidence to support the court's finding that appellant was "gravely disabled"; (2) the statute (§ 5350 et seq.) was not intended to be used to establish conservatorships for nondangerous mentally ill persons; and (3) government regulation of religious expression is improper where that activity does not pose a substantial threat to public safety, peace or order.

Elsie Smith, 43 years old, is a resident of Humboldt County, California. Her current marital status is unknown, but she has two brothers and seven children. She has no fixed income and no home address.

At intermittent periods for the last five years, appellant has attended the Eureka Church of God in Eureka, California. In June 1985, appellant began an around-the-clock vigil outside the church. At the times she would enter the church, she would make a disturbance and interrupt services. The pastor of the church made several attempts to counsel her about receiving help, but his advice was ignored. The pastor also contacted the police on several occasions when appellant's behavior was particularly disruptive. On these occasions, the officers arrested appellant and took her to jail or to a nearby mental hospital.[2]

---

[2]Appellant admitted that she had been jailed as much as 10 times for her behavior. There is no record of any formal charges or convictions against her, nor how long she spent in jail for her behavior. Her medical records stated that she was admitted for "disturbing the church" on May 19, 1985. Appellant was detained for a few days, released, and admitted again for the same reasons on July 30, 1985, and released on August 7.

On August 1, Dr. Edward Bjerk, a psychiatrist associated with Humboldt County Community Mental Health Services in Eureka, determined that appellant was "gravely disabled" and recommended conservatorship for Smith. On August 2, the Office of the Public Guardian for Humboldt County (hereinafter petitioner) filed a petition for appointment of a temporary conservator. (§ 5352.) The court granted the petition the same day. Appellant was temporarily placed in Crestwood Manor, a secure psychiatric health facility for people requiring long-term care.

Pursuant to section 5354, petitioner filed a conservatorship investigation report recommending permanent conservatorship. At the court trial, a psychiatrist, testifying for petitioner, diagnosed appellant as suffering from a paranoid delusion, a condition manifested by appellant's fixation on the Eureka Church of God. According to the psychiatrist, appellant believed that she was the only person who could interpret the Bible. The psychiatrist concluded that appellant was "gravely disabled" because her mental disorder caused behavior which brought her into conflict with the community. However, the psychiatrist also concluded that her cognitive intellect and most of her personality was intact and, despite the disorder, she could feed and clothe herself and provide for her own place to live. The psychiatrist also testified that appellant had once gone AWOL from the facility, stayed at her aunt's house and then returned to the church.

Two other witnesses testified that food and money had been given to appellant over the past year, one time because of her "poor physical condition." Another witness testified that he had talked to appellant to persuade her to return to her family and that she had ignored his requests. He also noted that "lots of people offered to help her."

Appellant testified, stating that the Bible commanded her to "forsake all." She elaborated that she rejected shelter and income "in order to suffer with Christ" and she would be "sanctified" by obeying the Gospel's teachings. In response to a question from the trial court, she stated that she did not want any income.

## II

Sections 5350 through 5371 (Conservatorship for Gravely Disabled Persons) were enacted as part of a comprehensive statutory scheme, the Lanterman-Petris-Short Act of 1967 (LPS Act).

The LPS Act instituted fundamental changes in the confinement and treatment of nondangerous mentally ill persons. It was enacted in response to the report of the California Assembly Ways and Means Subcommittee

on Mental Health Services, entitled The Dilemma of Mental Commitments in California (1978) (hereinafter Report), which criticized the then existing programs for the mentally ill and proposed many of the changes adopted by the Legislature. (See Morris, *Conservatorship for the "Gravely Disabled": California's Nondeclaration of Nonindependence* (1978) 15 San Diego L.Rev. 201, 204, fn. 21; see also *Conservatorship of Chambers* (1977) 71 Cal.App.3d 277, 282 [139 Cal.Rptr. 357].)

One of the primary objectives of the LPS Act is "[t]o end the inappropriate, indefinite, and involuntary commitment of mentally disordered persons . . . and to eliminate legal disabilities." (§ 5001, subd. (a); *Conservatorship of Early* (1983) 35 Cal.3d 244, 250 [197 Cal.Rptr. 539, 673 P.2d 209]; Report at p. 137.) The Report specifically addressed the problems of the "gravely disabled"—people who, due to a mental or physical disorder, are helpless or otherwise unable to take care of themselves. This group was comprised of nondangerous individuals clearly deserving of the protections against involuntary confinement, but who also would be in need of immediate, possibly involuntary treatment: "the young man who becomes uncommunicative, does not leave his room, refuses to eat, perhaps even soils himself; or the young woman who faints and thereafter remains unresponsive and acts as if she were unconscious. . . . [¶] . . . [those who] suffer from bodily illness . . . [or] develop medical problems as a result of their behavior . . . ." (Report at pp. 137-138.) "[A]mong all persons seen in a screening unit, . . . about 25 percent will be classifiable as 'gravely disabled' . . . . Among this 25 percent are a high proportion of aged senile persons, or physically debilitated alcoholics . . . ." (Report at p. 138, fn. 154.)

The clear import of the LPS Act is to use the involuntary commitment power of the state sparingly and only for those truly necessary cases where a "gravely disabled" person is incapable of providing for his basic needs either alone or with help from others. (See *Conservatorship of Early, supra,* 35 Cal.3d at p. 253; Report at pp. 137-138.) Those persons considered "gravely disabled" were the "*exceptional emergency cases* when the person is so disabled . . . that they are incapable of participating in planning for their own needs." (Report at p. 137, italics added.) The Report proposed that for a person to be "gravely disabled," he must be incapable of carrying on transactions necessary for survival and otherwise providing for such basic needs as food, clothing and shelter. (Report at p. 133.) The Report stated that this was a specific description of "an incapacitated person in need of immediate treatment." (Report at p. 138.)[3]

---

[3]However, since the enactment of the LPS Act many critics charge that those responsible for initiating conservatorship proceedings, as well as the courts, have lost sight of the goals of the act. (See, e.g., Morris, *Conservatorship for the "Gravely Disabled": California's*

■ We conclude that in order to establish that a person is "gravely disabled," the evidence adduced must support an objective finding that the person, due to mental disorder, is incapacitated or rendered unable to carry out the transactions necessary for survival or otherwise provide for her basic needs of food, clothing, or shelter.

This conclusion is consonant with *O'Connor v. Donaldson* (1975) 422 U.S. 563 [45 L.Ed.2d 396, 95 S.Ct. 2486]. In *Donaldson,* petitioner had been confined in a mental institution for 15 years without treatment. The high court rejected the belief that the state may confine the mentally ill to ensure them a living standard superior to that they enjoy in the private community. "[I]ncarceration is rarely if ever a necessary condition for raising [their] living standards." (At p. 575 [45 L.Ed.2d at p. 407].) ■ The court held that "a State cannot constitutionally confine *without more* a nondangerous individual who is capable of surviving safely in freedom by himself." (At p. 576 [45 L.Ed.2d at p. 407], italics added.) The "more" required by the Supreme Court, we feel, encompasses the standard for "gravely disabled." "[P]ublic intolerance or animosity cannot constitutionally justify the deprivation of a person's physical liberty." (At p. 575 [45 L.Ed.2d at p. 407].) Bizarre or eccentric behavior, even if it interferes with a person's normal intercourse with society, does not rise to a level warranting conservatorship except where such behavior renders the individual helpless to fend for herself or destroys her ability to meet those basic needs for survival. Only then does the interest of the state override her individual liberty interests.

### III

■ The public guardian must prove the proposed conservatee was "gravely disabled" beyond a reasonable doubt. (*Conservatorship of Roulet* (1979) 23 Cal.3d 219, 225-226 [152 Cal.Rptr. 425, 590 P.2d 1].) The stricter criminal standard is used because the threat to the conservatee's individual liberty and personal reputation is no different than the burdens associated with criminal prosecutions. (*Id.,* at p. 223.)

*Nondeclaration of Nonindependence, supra,* 15 San Diego L.Rev. 201 [conservatorship is an "escape hatch" to prolong the institutional confinement of nondangerous people]; Tieger & Kresser, *Civil Commitment in California; A Defense Perspective on the Operation of the Lanterman-Petris-Short Act* (1977) 28 Hastings L.J. 1407 ["gravely disabled" is a "catch-all" category]; McGraw & Keilitz, *The Least Restrictive Alternative Doctrine in Los Angeles County Civil Commitment* (1984) 6 Whittier L.Rev. 35 [same]; cf. Keilitz et al., *A Study of Involuntary Civil Commitment in Los Angeles County* (1984) 14 Sw.U.L.Rev. 239 [the state, acting as petitioner, promotes its own interest rather than those of the ward]; Warren, *Involuntary Commitment for Mental Disorder: The Application of California's Lanterman-Petris-Short Act* (1977) 11 Law & Society Rev. 629 [considerations of individual rights and the protection of society are displaced in conservatorship proceedings].)

■ ■■ ■ We apply the standard enunciated above to the facts as found by the trial court:[4] Appellant suffers from a mental disorder which commands her to maintain a vigil outside a particular church. At times, she engages in displays of disruptive behavior, interrupting church services. Her fixation on the church results in her sleeping on the sidewalk in front of the church at night, and on one past occasion this may have caused her to become sick. She has no income, no savings and no permanent home. However, the record also reveals that the psychiatrist believes that she is able to obtain food, clothing and shelter, and that appellant regularly receives offers of help and does at times accept assistance.

■ We conclude that there is insufficient evidence to prove appellant is "gravely disabled" beyond a reasonable doubt. Despite her admittedly bizarre behavior, appellant is not, nor has she been, incapacitated or unable to carry out the transactions necessary to her survival. No evidence was adduced to show that appellant, because of her mental condition, was suffering from malnutrition, overexposure, or any other sign of poor health or neglect. Her refusal to seek shelter is not life threatening. There was uncontradicted evidence that she accepts offers of food and money from friends and relatives. Appellant evinces a strong, sincere—if unorthodox— belief in God, her religion and her place in religion. Under these circumstances, we conclude that appellant is not "gravely disabled" to justify appointment of a conservator.[5]

We do not say, however, that from a more complete record appellant could not be adjudicated "gravely disabled." However, the limited testimony adduced at trial compels our conclusion today. Our conclusion might have changed had more extensive testimony on the effect of appellant's behavior on her health and well-being been elicited, or a more thorough investigation properly introduced into evidence been presented. In this case, however, the investigation mandated by section 5354 was reduced to a two-page typed *form* on which the investigator simply checked the appropriate boxes. The report does not disclose whether suitable alternatives were considered. Nor does it disclose why appellant's relatives, who could have provided an alternative to institutionalization, were never contacted by petitioner despite their proximity to the proceedings. Most importantly, the report does not disclose why appellant is considered to be gravely disabled.

---

[4]We note that appellant's conservatorship expired on September 27, 1986, and thus is technically moot. However, when issues raised are of great public interest and are likely to recur, the court may use its inherent discretion to resolve the issue. (See *In re William M.* (1970) 3 Cal.3d 16, 23 [89 Cal.Rptr. 33, 473 P.2d 737].) Because the statute allows for an indefinite series of one-year commitments, we exercise our discretion and decide this issue.

[5]At least one philosopher has advised that "[m]ost of the luxuries, and many of the so-called comforts, of life are not only not indispensable, but positive hindrances to the elevation of mankind." (Thoreau, Walden (1854) p. 11.)

We realize that our ruling today will add an extra burden to the already scarce fiscal and manpower resources of the public guardians, particularly in the smaller counties of this state. Incarceration, though an alternative, does not begin to address the plight of people such as appellant. They are victims of a malady over which they frequently had no part in bringing about.

Because of the resolution of this case, we need not address appellant's contention regarding religious beliefs and the conservatorship statute.

The judgment and order appealed from are reversed.

Haning, J., concurred.

**KING, J.**—I concur that the evidence in this case is insufficient to prove beyond a reasonable doubt that appellant is gravely disabled within the meaning of the Lanterman-Petris-Short Act (LPS). However, this case is exemplary of the human tragedies that have resulted from LPS.

Every citizen in California will surely be horrified to learn that the only possible legal recourse where a nondangerous mentally ill person continuously engages in unlawful conduct, but can provide food, clothing and shelter for herself, is to repeatedly place that person in jail for disturbing the peace. More should be expected from a civilized society. It would seem we are now reaping the harvest from seeds planted in the 1960's by the Legislature's adoption of California's public policy toward the seriously disturbed, but nondangerous, mentally ill. A great many seriously disturbed men and women now inhabit the downtown areas of our major cities, too mentally ill to avoid running afoul of the law but not ill enough to be treated under an LPS conservatorship. If civil commitment with treatment provided to cope with mental illness is inappropriate for such persons, incarceration in county jail is certainly even less appropriate. Yet, as the facts in this case demonstrate, this is exactly what has resulted from the public policy provided by LPS.

Access to needed medical care is a basic human right, and is of particular importance to those whose very illnesses cause them to refuse care. Perhaps this is the proper time for the Legislature to reexamine public policy toward the mentally ill and ensure the provision of essential medical treatment to those who so desperately, both literally and figuratively, cry out for it.

Without some change in public policy, the phenomenon of dramatically increasing numbers of the mentally ill living on the streets and in the

doorways of our major cities, and paying periodic visits to our county jails, will all too certainly become an integral part of contemporary society.