Filed 10/31/13  Conservatorship of M.P. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| Conservatorship of the Person of M.P. <br><br> MATT DOMNICK, as County Conservator, etc., <br><br>　　　　Petitioner and Respondent, <br><br> v. <br><br> M.P., <br><br>　　　　Objector and Appellant. | A138544 <br><br> (Contra Costa County Super. Ct. No. P12-01478) |

## I.  INTRODUCTION

Objector and appellant M.P. challenges the trial court's appointment of a temporary conservator pursuant to Welfare and Institutions Code[1] sections 500 et seq. (the Lanterman-Petris-Short Act or LPS Act).  She argues that substantial evidence does not support the court's finding that, as a result of her mental disability, she is unable to provide for her own basic personal needs of food, clothing or shelter.  We find that the court's determination of grave disability is supported by substantial evidence and affirm its order.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

1

## II. FACTUAL AND PROCEDURAL BACKGROUND

On December 12, 2012, petitioner William B. Walker, M.D., Director of the Contra Costa County Health Services Department filed a petition for appointment of a temporary conservator of appellant M.P. In facts set forth in a declaration for temporary conservatorship, petitioner stated that M.P. was "[g]ravely disabled as a result of mental disorder and unwilling to accept, or incapable of accepting, treatment voluntarily." He also described M.P. as "unable to manage . . . her financial resources." The petitioner sought a one-year conservatorship "with the statutory powers recommended in the conservatorship investigation report, including the authority to detain the proposed conservatee in a facility described by . . . § 5358 (a)(2); with the right to require the conservatee to receive treatment related specifically to remedying or preventing the recurrence of the proposed conservatee's being gravely disabled, including psychotropic medications; and with the right to require the proposed conservatee receive routine medical treatment . . . ."

The declaration further stated that M.P. was "placed on 5150 from Nierika House due to agitated, disorganized behavior there. She was not sleeping, was standing out in the rain with no shoes on, stealing from others. Speech was loose and disorganized. Nierika House staff felt unable to manage her and will not accept her back there. She had no plan to provide for her own food, clothing and shelter."

The petition stated that M.P.'s "[d]iagnosis is Schizoaffective Disorder. [She] is labile, disorganized, delusional and severely lacking in insight and judgement [sic]. Repeatedly demands to be discharged despite having no plan to care for herself and nowhere to go. Due to her repeated admissions and consistently demonstrated inability to maintain stability in the community, her case manager is advocating strongly for her to be permanently conserved and admitted to a long-term locked facility."

According to petitioner, "due to her mental illness, [M.P.] is too disorganized, labile and lacking in judgement [sic] to understand and acknowledge her condition and situation." For the same reason, petitioner considered M.P. "unable to understand the benefits and risks of, and alternatives to, psychotropic medication" and "unable to

understand and to knowingly and intelligently evaluate the information required to be given to patients whose informed consent is sought and to otherwise participate in treatment decisions by means of a rational thought process."

Attached to the petition was a declaration from Jonathan Kalkstein, MD and PhD., stating his determination that M.P. is "gravely disabled" within the meaning of section 5008, subdivision (h).

M.P. objected to the conservatorship and a court trial was set for April 16, 2013 and then continued to April 17, 2013.

At the trial, Dr. Michael Levin, an expert in psychiatry and the assessment of the "gravely ill" standard under the LPS Act testified that he met with M.P. on April 10, 2013 at Crestwood in Stockton. She had been living there for several weeks and had previously lived at a facility called Our House in Vallejo. She left Our House "because she got ill" and went to the county hospital. After a stay on the medical unit and then the psychiatric unit, she was transferred to Crestwood in Stockton.

In addition to meeting with M.P.,[2] Levin reviewed M.P.'s medical records from Crestwood Stockton. He also reviewed the conservator's report and review that had been most recently conducted, and another one that had been conducted 21 months earlier. He did not review any other medical records. He spoke to the conservator, Matt Domnick and to M.P.'s caseworker, Jeff Boxer. He also spoke to one of the psychiatrists who had seen her in the past, Dr. Khan, and to a psychiatrist who cared for her recently at a county facility, Dr. John Echols, "whose specialty is psychiatry . . . and takes care of people who have psychiatric problems on the medical units, and he's extremely experienced and knowledgeable."[3]

---

[2] Levin testified that his meeting with M.P. occurred on April 10, 2013, and "was probably somewhere in the neighborhood of 45 minutes to 50 minutes, maybe as much as an hour, but somewhere in that range."

[3] Levin spoke with Dr. Echols "[p]robably five minutes. It was in passing. I happened to be at a meeting together. I had seen that he had taken care of her. He knew her from prior hospitalizations there. He had some history, as well, so that was very helpful." He also spoke with Dr. Khan, another of M.P.'s doctors. Khan "works at the

3

Levin diagnosed M.P. with "schizoaffective disorder," the same diagnosis he had "seen in the record and seems most appropriate." He testified that he had reviewed "records that go back into in the—maybe even to the 80s, but at least 97. I have a list of some of the psychiatric contacts that she's had with the county that date quite a ways back in terms of, you know, where she was seen, by what clinicians and so forth. So, it goes back to, you know, some—see if I can find out exactly how far back it goes, but a long time. I think that when I asked her, I think she said that she got started having psychiatric problems somewhere in her mid-thirties . . . ." He discussed with her this diagnosis and "she acknowledged that was the diagnosis that people had made," and she agreed that she suffered from a mental illness. "[S]he recognized that . . . when she's not in a very controlled environment, she is very quick to relapse. And that's why she's had 200 plus contacts with the mental health system, not just because of her psychiatric illness, although that certainly could occur, but also because she has a compounding medical problem which effects her psychiatric status. [¶] That is, that she has fairly significant chronic obstructive pulmonary disorder and she has a hard time—well, she's not been able so far to not smoke. And when she smokes, even a small amount, it sounds like she can get hypoxic, that is low blood oxygen, and that affects her psychiatric status and she can come unglued, and that seems to be what happened when she was at the facility in Vallejo." Although M.P. told him that she had been reducing her smoking to "maybe two or three cigarettes even per week" "[i]t doesn't take too much, evidently."

Levin's information about M.P.'s smoking came not only from M.P. herself, but also from her conservator. His conclusion that smoking exacerbated her mental illness

same Concord mental health clinic that I work, and I see him occasionally on Thursday. And was in the hall, probably was maybe you know five—less than five minutes, just a conversation that he had seen her over a period of time." He "just made a passing comment that, you know, her psychiatric condition was a serious one, and severe one . . . and that he was familiar with her." He also spoke to her case manager, Boxer, "about her on several different occasions, actually. And I would say maybe total of say 15 minutes, I guess, I'm estimating." He also reviewed M.P's medical records from Crestwood Stockton.

4

came from M.P.'s "past history," and information he received from one of her doctors, Dr. Echols. This same issue came up in a conversation with her case manager, Boxer, who "also mentioned that's been a pattern that that's happened on a number of occasions in the past that she goes back to smoking and then gets psychiatrically decompensates rather rapidly." He explained that M.P.'s blood oxygen level was already compromised even when she wasn't smoking. Although M.P. "responds quickly to medication, but when she goes out of these facilities and smokes, then she can get either confused or forget to take her medicine."

Levin elaborated that M.P.'s rapid decompensation was due to a combination of her schizoaffective disorder, her smoking behavior and her low oxygen level. He testified that, based on his review of M.P.'s medical history, "she has the capacity in a rather short period of time, I'm not saying minutes, but within 24, 48 hours of decompensating rather rapidly." He believed M.P. is "quite addicted"[4] and this behavior "affect[s] her psychiatric status."

Based on his conversation with her, Levin understood that M.P. knew that she needed to be on medication for her mental illness. He also believed that she wasn't sure if she wanted to be in a conservatorship. "She vacillated and changed, and her idea, she wanted to be—have more control of her life, and she would like to have been off conservatorship. But at the end of our conversation, she said that she sort of knew that she needed to be on conservatorship, but that she still wanted to have a trial." M.P. did not have clear plans about where she would live should she no longer be conserved.

In addition, M.P. told him that "[s]he knows that she shouldn't smoke, but up to now has not been able to refrain from it. She's aware that can impact her psychiatric status as well as her physical health, and it's not good for her." She understood that "the

---

[4] According to Levin, M.P. told him "that she could make all the different kinds of promises to herself not to smoke, but that it was very difficult. She was—she hadn't been—up to now, been able to refrain from smoking. That she not only likes it, but she's very addicted." Although she had enough insight to know she should stop smoking, she didn't tell him she wanted to stop smoking.

smoking interacted poorly and affects her mental [and physical] condition, ultimately." Nevertheless, M.P.'s insight into her condition was limited. Based on his interview with her, he "didn't get the sense that she was fully aware of how gravely disabled or how badly she can become quickly in terms of psychiatric things, and her behavior, which, usually the descriptions are fairly graphic and have to do with her losing control of herself, screaming at people, stealing from other people in the units that she's living, sometimes having a hard time making it to the bathroom, things of that nature that are fairly dramatic . . . ." This behavior, according to Levin, "symptomatic of schizoaffective disorder . . . [¶] . . . [A]nd of delusional kind of behavior and agitation . . . ."

Rather than understanding that these problems were due to her mental illness, M.P. "put it down, basically, that when she gets sick she gets confused or loses—gets disoriented, basically, that was the way she put it. So I don't think my sense was that she doesn't fully recognize or remember or is aware of sort of regressed her behavior becomes."

He did not believe that she could be on her own in the community if she continued to smoke. He testified that "it's a progressively downhill course. . . . [I]f she's not able to refrain from smoking I think she's going to have recurrences. That's why this current facility which doesn't allow for passes and for her to have access to smoking, I think she's done very well from a psychiatric point of view there."

Levin concluded that M.P. is "currently gravely disabled because she continues to want to smoke, doesn't think that she's going to be able to not smoke. She has also a very sort of unstable fragile version of schizoaffective disorder, that is that I think she can decompensate rather rapidly, maybe over the course of a day or maybe even shorter. And so I think out of this controlled environment, even a controlled environment, semi-controlled environment like the one in Vallejo, she wasn't able to be maintained there. So, I think that just by history of by the number of times that she's—whenever given a chance to be off conservatorship, she's relapsed very rapidly. There have been many efforts in the past to have her live more independently, and she's not been able to."

6

On cross examination, Levin agreed that based on his observations of M.P., she would be fine "walking into a store, making grocery purchases, dealing with a cashier, all of those things." He stated that his "sense is that she's sharp and is able to talk with people and knows what's going on in the community for sure." However, if she "was off conservatorship and walked outside and bought some cigarettes and began smoking this afternoon," she "would . . . be able to find food, clothing, and shelter . . . [¶] . . . within 24 hours. . . . [L]onger than that, maybe 48 hours . . . she might have trouble. . . . [T]hat might very well be enough to trip her into—and in the past, it's sort of what's happened. [¶] She gets disoriented, or as she said, disoriented, she gets psychiatrically ill, then forgets to take her medicine. Then it's sort of a sequence that goes downhill quickly."

Levin agreed with the trial court's characterization of M.P.'s behavior that if she "were in the land in which there were absolutely no cigarettes available to her or anyone else, this lady could function perfectly fine in a nonrestricted environment, assuming she was taking her medication." He stated, however, that "it's certainly possible that people, you know, who are not smokers and have her kind of illness could have a recurrence and relapse. [¶] That is, . . . her version of schizoaffective disorder means that she's rather labile. It can rapidly shift."

Matt Domnick had been M.P.'s conservator for three or four months before he testified. In that time, he met with M.P. face to face four times: once at Our House for a 20-minute meeting and three times for court hearings. He had also spoken with her on the phone twice.

Three weeks before the trial, M.P. began a placement at a locked facility, Crestwood Stockton. During the three months that Domnick had been her conservator, M.P. had had five different placements before Crestwood Stockton.

Her case was initially referred to Domnick after she was hospitalized at John Muir Medical Hospital. On December 20, 2012, she was given a community placement at Our House. After about a week, M.P. began to behave in ways that caused the staff at Our House concern, such as "[w]alking into peers' rooms, stealing items. . . . [H]er speech . . . was a little more tangential, harder to have a conversation with her, and . . . impulsive

7

behavior was increased as well." According to Domnick, her behavior indicated that she may not have been taking her medication. Because of her instability, the staff at Our House believed "she might have needed a change in her medication and they were not able to house her there . . . ." On January 10, 2013, M.P. was admitted to Contra Costa Regional Medical Center for "stabilization." She quickly stabilized and on January 31, 2013, she was back at Our House.

She did not, however, remain stable at Our House. She "left with a male friend of hers without staff's knowledge and they actually found her at a bus stop early the next morning without shoes on. [¶] She reported that it was a boyfriend and they had gone to Concord to hang out with friends, and that he had stranded her. [¶] . . . [A] staff member . . . found her at the bus stop and then brought her back to the facility. [¶] And in addition to that, there was increase in the behavior as far as the stealing, the tangential speech, the more difficulty to work with her."

Domnick learned from the operator of Our House that "within the first week [M.P.] started smoking" despite the staff's efforts to prevent her from doing so. They didn't know where she was getting cigarettes. However, 95 percent of the residents smoked and "it was really difficult in that type of setting to control her smoking when she had so much freedom," including a grocery store within easy walking distance.

The second time M.P. was at Our House (following a transfer from Contra Costa Regional Medical Center), she decompensated after smoking and "wasn't showering, [her] room was a mess." In addition, "she was not changing her clothes appropriately and was soiling herself." At that point, she was again sent to Contra Costa Medical Center, where she was initially treated for an extremely low blood oxygen saturation level.[5] While in the medical unit, she refused to be given oxygen. Because the staff was having difficulty treating her, when she was stabilized, she was transferred from the medical unit to the psychiatric unit.

---

[5] M.P.'s oxygen saturation problems were related to the COPD from which she suffers as well as her hypertension.

After several weeks at Contra Costa Regional Medical Center, she was transferred to a locked facility at Crestwood Stockton. Domnick also testified about an incident that had occurred the day before in which M.P. obtained cigarettes, which she had smoked when she returned to Crestwood Stockton. When Domnick pointed out that there had just been "a long discussion in court about your smoking, your medications and your treatment" M.P. "basically said she didn't agree with that. She basically didn't have the insight into it." He stated that the problem wasn't cigarettes, "[i]t'd be her decision-making."

Since the mid-1990's, M.P. had shown a pattern of "decompensating [and] getting better rather quickly . . . ." Domnick testified that if M.P. were released from her conservatorship, he did not believe she "would voluntarily seek treatment for her mental illness."

M.P. testified that she had asthma, not COPD, as Levin testified. She presently smoked "one cigarette or two a day." She did not believe that this amount of smoking decompensated her. She stated that she was initially brought to John Muir "[b]ecause I fell down my stairs on my way to Walnut Creek Social Security office to get a printout and a readout to take back to Jeff Boxer to take to Dr. Khan to be my own money manager, be my own payee and not the county's problem housing me." She also testified that she was at Contra Costa Regional Medical Center because "I get a cold and it turns into pneumonia whether I take medication or not. I get pneumonia every year in the wintertime."

When asked if she was concerned about her smoking, M.P. stated that "I'm not because smoking is hazardous, and I don't smoke but two cigarettes a day. I will get the patch this time." She had done so in the past, but she "took it off because I wanted to smoke." She repeated her belief that "[s]moking doesn't decompensate. I don't think it's an issue when I only smoke one or two cigarettes a day."

She also admitted that after court the day before she had gone out and bought cigarettes, which she had then smoked when she returned to Crestwood Stockton. At the time, she did not think this was a bad idea "because whether smoking seems bad for a

9

person, I need to try to quit and I need the help and buy the patch to help, quit smoking because I'm addicted. And once I'm addicted, I'm having trouble with smoking. And I need the patch to help me through my addiction."

At the conclusion of three days of trial, the court found Levin's testimony credible, and concluded that M.P. is "gravely ill and unable to provide for herself at this time." It explained that "I have thought long and hard about the situation and continued to as further evidence has been adduced here, including the evidence this morning. And it's been a challenge . . . because this situation [is] certainly somewhat unique for me at the moment. [¶] . . . I accept Dr. Levin's testimony about this lady suffering from COPD. Now, you don't conserve somebody because they have that condition, nor do you conserve somebody who is craving for cigarettes, smokes cigarettes, has the COPD and then as a consequence her—I think the phrase is de-oxygenation. But oxygen levels in the blood are suppressed and because of that various mental difficulties follow. [¶] Because there are any one of a number of people in this country, or other countries, who all of those things are true of and they're not mentally ill and they're not going to be conserved by anyone. I mean, you can't or shouldn't conserve somebody because of some physical disability that they have. . . . [¶] . . . [M.P.] suffers from a mental illness. Dr. Levin testified to that [M.P.] acknowledged that mental illness. [¶] But for the COPD and the smoking, it sounds from everything that I've heard that that mental illness could be alleviated, treated and in such a fashion that most likely a conservatorship would not be needed . . . . Because I had no evidence at all that she was . . . [de]compensating until the cigarettes appear on the scene. [¶] But they do. But they do. And what I'm concluding is it's her mental illness that is preventing her from appreciating the situation about the cigarettes and the COPD. And then as a consequence, it's her mental illness that deteriorates. And when her mental illness deteriorates, there goes her ability to provide for her food, her shelter and her clothing. . . . [¶] . . . [M]y final decision is that she does—she does—she is gravely ill and is not able to provide for herself at this point."

The court appointed a conservator for M.P. and this timely appeal followed.

### III. DISCUSSION

The LPS Act governs the involuntary treatment of the mentally ill in California. Under the LPS Act, a conservatorship may be established for any person who is gravely disabled as a result of a mental disorder. (§ 5350.) "Gravely disabled" is defined as: "A condition in which a person, as a result of a mental disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter." (§ 5008, subd. (h)(1)(A).) "Grave disability must be proven beyond a reasonable doubt to establish and to renew LPS conservatorships. [Citations.]" (*Conservatorship of Johnson* (1991) 235 Cal.App.3d 693, 696.)

When a conservatee challenges the establishment of a conservatorship under the LPS Act, we apply the substantial evidence test to determine whether the record supports a finding of grave disability. The trial court's finding can be supported sufficiently by a single witness. (*Conservatorship of Walker* (1989) 206 Cal.App.3d 1572, 1577.) In addition, we " 'review the whole record in the light most favorable to the judgment below . . . .' [Citation.] Substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom. [Citation.]" (*Ibid.*)

Substantial evidence supports the court's conclusion that M.P. is gravely disabled. Michael Levin, an expert witness in the field of psychiatry, testified that M.P. suffers from schizoaffective disorder. He also testified that because she had been diagnosed with "fairly significant chronic obstructive pulmonary disorder" and is unable to stop smoking, she regularly becomes "hypoxic" and, because of the significantly low blood oxygen that results, her psychiatric status is affected and she decompensates, which is to say her mental state unravels. She then is unable to function in the most basic ways, including "sometimes having a hard time making it to the bathroom." In a controlled environment in which she is unable to smoke, M.P.'s mental illness can be properly treated. In an uncontrolled environment, because M.P. continues to want to smoke, she decompensates rapidly. This testimony constitutes substantial evidence to support the trial court's finding that M.P. suffers from a grave disability.

M.P., however, argues that Levin's testimony does not constitute substantial evidence of a grave disability because it is mere conclusion, similar to expert testimony in *People v. Bassett* (1968) 69 Cal.2d 122, 144-146). She is incorrect. In *Bassett*, the court held that evidence from expert witnesses who had neither met nor examined a criminal defendant could not constitute substantial evidence. Here, in reaching the conclusion that these factors led to a grave disability, Levin relied on his interview with M.P., his review of her medical records, and brief conversations with her doctors as well as with her present conservator. Far from being mere conclusion his testimony was based on a thorough understanding of M.P.'s psychiatric history as well as an understanding of her present mental condition. Although he was informed by several people—including M.P. herself—that she had been diagnosed with schizoaffective record, there is no evidence in the record that his own diagnosis was anything other than his independent conclusion.

M.P. also challenges the court's finding that her mental disorder renders her "unable to provide for his or her basic personal needs for food, clothing, or shelter." (§ 5008, subd. (h)(1)(A).) She is incorrect. Domnick testified, based both on direct experience and his understanding of M.P.'s past experiences, that, when M.P. smokes she has difficulty performing even the most basic tasks. The trial court could draw from this evidence the reasonable inference that a person who has difficulty performing basic tasks as a result of a mental illness would be unable to care for herself in the more complex endeavors involved in providing oneself with food, clothing and shelter. Indeed, the record shows that, when asked, M.P. had no specific plan for finding shelter in the event she was no longer on a conservatorship. Levin and Domnick also testified that, based on her past behavior and their understanding of the effect smoking had on her mental illness, once off conservatorship, M.P. would most certainly smoke, decompensate, and be unable to continue taking her medication. As Levin put it, if M.P. "was off conservatorship and walked outside and bought some cigarettes and began smoking this afternoon," she "would . . . be able to find food, clothing, and shelter . . . . [¶] . . . within 24 hours. . . . [L]onger than that, maybe 48 hours . . . she might have trouble. . . . [T]hat

12

might very well be enough to trip her into—and in the past, it's sort of what's happened. [¶] She gets disoriented, or as she said, disoriented, she gets psychiatrically ill, then forgets to take her medicine. Then it's sort of a sequence that goes downhill quickly." The evidence also established that M.P. had little insight into her illness, believing that smoking did not lead to any problems other than the fact that it was generally "unhealthy."

In sum, Levin's testimony, supplemented by Domnick's observations about her condition, constitutes substantial evidence to support the trial court's finding that she suffers from a grave disability.

M.P. further argues that there is not substantial evidence that any mental disorder she suffers from would lead to a situation that would present a "physical danger to the self." She bases this contention on language in *Conservatorship of Smith* (1986) 187 Cal.App.3d 903. In that case, the trial court had before it an expert's testimony that a conservatee's "mental disorder caused behavior which brought her into conflict with the community. However, the psychiatrist also concluded that her cognitive intellect and most of her personality was intact and, despite the disorder, she could feed and clothe herself and provide for her own place to live." (*Id.* at p. 907.) In such a situation, the court found that the trial court did not have substantial evidence on which to base a finding that the appellant was gravely disabled. The court also noted that "[n]o evidence was adduced to show that appellant, because of her mental condition, was suffering from malnutrition, overexposure, or any other sign of poor health or neglect. Her refusal to seek shelter is not life threatening. There was uncontradicted evidence that she accepts offers of food and money from friends and relatives. . . . Under these circumstances, we conclude that appellant is not 'gravely disabled' to justify appointment of a conservator. [¶] We do not say, however, that from a more complete record appellant could not be adjudicated 'gravely disabled.' " (Id. at p. 910, fn. omitted.)

*Smith* does not—nor could it—impose an additional requirement that the petitioner must show that the inability of the conservatee to provide for herself presents a physical danger, although certainly it is implicit that such an inability would almost inevitably lead

13

to such a situation.  Rather, the court's comment simply underlines the paucity of evidence that Smith was in any way unable to feed, clothe, and shelter herself. Here, of course, expert testimony established that, due to her mental condition, M.P. could not provide for her basic needs.  No further showing was required.

## IV.  DISPOSITION

The judgment is affirmed.

_____
Haerle, J.

We concur:

_____
Kline, P.J.

_____
Brick, J.*

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.