Filed 6/23/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| Conservatorship of the Person and Estate of JESSE G. | |
| PUBLIC GUARDIAN OF MENDOCINO COUNTY, <br><br>     Petitioner and Respondent, <br><br> v. <br><br> JESSE G., <br><br>     Objector and Appellant. | A145749 <br><br> (Mendocino County Super. Ct. No. SCUKLPSQ15-1789) |

Appellant Jesse G. appeals from the trial court's orders appointing the Mendocino County Public Guardian (public guardian) conservator of his person and estate pursuant to section 5350 of the Lanterman-Petris-Short Act (LPS Act) (Welf. & Inst. Code, § 5000, et seq.),[1] and imposing certain special disabilities. On appeal, he contends substantial evidence did not support either the court's finding that he was gravely disabled (§§ 5008, subd. (h)(1)(A); 5350), or its imposition of the special disability denying him the right to refuse treatment related to his grave disability (§ 5357, subd. (d)). Because we conclude substantial evidence did not support the court's finding that appellant was gravely disabled, we shall reverse the order appointing a conservator.

**BACKGROUND**

On April 9, 2015, the public guardian filed an LPS conservatorship petition for appointment of a conservator of appellant's person and estate, pursuant to section 5350,

---

[1] All further statutory references are to the Welfare and Institutions Code.

and also seeking imposition of several special disabilities, pursuant to section 5357. On May 7, the public guardian filed an investigator's report, pursuant to section 5354, recommending the appointment of an LPS conservator and imposition of the requested special disabilities.

After appellant informed the court of his intention to contest the petition, the court held a bench trial on June 29, 2015. Dr. James Holden testified for the public guardian as an expert on the issue of grave disability. On June 16, Dr. Holden had interviewed appellant for 65 minutes and had reviewed numerous documents, including a recent functional assessment and psychological evaluation, the conservatorship investigator's report, and recent hospital treatment and progress notes. Dr. Holden testified that appellant had recently been hospitalized after bystanders who saw him near or on a bridge over the Russian River became concerned and called police. The police took him to a hospital, where he was evaluated, found to be gravely disabled due to a mental disorder, and hospitalized pursuant to section 5150. Appellant was homeless at the time.

Appellant had a history of "[m]ultiple" prior hospitalizations in both Texas and California. He had been diagnosed during his most recent hospitalization with schizoaffective disorder, bipolar type. He had previously been diagnosed with antisocial personality disorder, as well as various substance abuse disorders, including amphetamine abuse, cannabis abuse, benzodiazepine dependence/abuse, caffeine-related disorder, and nicotine dependence/abuse. Appellant told Dr. Holden that he has taken psychiatric medications since childhood, starting with medication for attention deficit disorder. He also reported that he has had auditory hallucinations since childhood, but said, "[l]uckily I know the voices aren't real. When I put the right kind of energy out, they go away."

Dr. Holden further testified that appellant had not been compliant with his medications at the time of his most recent hospitalization, and had a history of being noncompliant. At the time Dr. Holden interviewed him, appellant was on his medications and told Dr. Holden that he would contact his former psychiatrist and continue taking his medications if released from conservatorship. Appellant said he believed there were two

medications that were particularly helpful to him: Zyprexa and Invega. Even on these medications, however, he continued to experience auditory hallucinations, which he had described as being "just pissed-off white kids. They are listening to us right now. They go away when I am around good energy and good memories." Appellant also exhibited "paranoid ideations" during the interview, saying that the police and some of the medical staff had plotted against him and inaccurately described his condition. With schizoaffective disorder, the symptoms can be kept under control "[t]o a degree. There can be residual symptoms even with the medication."

Appellant told Dr. Holden that he had a friend he wanted to stay with. The friend, Mike Elmer, called Dr. Holden and told him that he knew appellant's father well and had prior experience helping appellant. Nevertheless, after evaluating appellant, Dr. Holden concluded "that he currently remains gravely disabled. I didn't find a verifiable plan, [a] realistic verifiable plan to provide for his own food, shelter, and clothing or the presence of a third person that could assure those things were provided for him." When the court asked how appellant's mental condition interferes with his ability to provide for his food, shelter, and clothing, Dr. Holden stated, "It disrupts his thinking, his logic, reasoning. It's led him to live out in the woods on various occasions. And [to] have aspirations to live a free lifestyle that I felt would be very difficult for him to pull off. I felt he would be very easily taken advantage of and has been in the past, I believe." Dr. Holden further testified, however, that appellant had said he did not want to live on the streets anymore, and "would eventually like to end up in a house of his own."

Appellant testified, as part of the public guardian's case in chief, that he first learned of his schizophrenia diagnosis when he was 17 years old, and he began "breaking down and hearing voices" when he was 22. He did not really believe the voices were real, but nonetheless thought "there is some sort of motivation somewhere to where these people are bothering me. I don't really think I have a mental condition. I think [I] am being victimized by other people that are jealous of me." When asked if he did not believe he has a mental illness, appellant responded, "No. I didn't say I don't have mental conditions, but it doesn't make me ill. [¶] . . . [¶] I don't really think I have a

3

mental condition. I am actually a very intelligent person." Appellant believed people victimized him because they had taken his kindness for weakness and they stole things from him.

Appellant testified that the medications he was taking—Cogentin, Trileptal, Perphenazine, and Invega—helped, but also believed that "it really doesn't matter if I take them or not, because it is more of a psychological problem and drugs . . . just null [*sic*] the pain, but they—they can't—they can't really heal schizophrenia." Regarding Dr. Holden's testimony that appellant had said he believed the police and medical personnel had plotted against him, appellant testified that that was not true, and that the people who called the police "made up a story saying I was going to jump. . . . [They] were saying I was waiving [*sic*] my hands, that I was . . . going to jump or something. That is an absolute lie." Instead, appellant testified, "I was lured up there by four of these kids who have just . . . been out to get me." As he was lying in the sun, "these kids came along and they started throwing pebbles at me, started calling me names and stuff. So I went out there to see what their deal was, I got to the top [of] the bridge and the four of them weren't even facing me. They had their backs turned to me, like they were scheming something, whatever. So I walked . . . across to the middle of the bridge, looking around, kind of enjoying the view and stuff." Appellant believed the claim that he was waving his hands and looking like he was going to jump "was a false report."

When asked about a statement he made to Dr. Holden that voices spied on him through his eyes, appellant said, "that was more of a religious belief" than anything else, "because it's the truth." He affirmed that he would take his medication if he were not on a conservatorship because it did help his vision and helped him to relax, even though it could not stop the voices. Regarding his specific plan to provide for himself, appellant testified that he had a steady income through social security, which would total $845.00 per month if he had a place to live. He wanted to live with his buddy Mike, whom he had known for over seven years and who had never taken advantage of him. Mike had a two-bedroom trailer and would manage his money and help him with budgeting. Mike would

drive him to appointments with his psychiatrist. Appellant also wanted to go back to church because, when he was in church, he never heard voices.

Michael Elmer testified on appellant's behalf. He had known appellant for about eight years and appellant had lived with him off and on for about a year. When appellant lived with him, he was compliant with household rules and had not exhibited any violent conduct. If appellant lived with him, there would be no drugs or drinking, and they would start going to church. He would keep any alcohol in his home locked up in his room. He also would drive appellant to appointments with his psychiatrist. Appellant would pay him $250 per month in rent. Elmer worked at Johnson's Pear Sheds and he planned to get appellant a job there too.

Elmer would also help appellant with buying groceries and taking his medicine twice a day. He was not aware of appellant having a drug problem, but believed "all kids have experimented." When asked what he would do if appellant did not take his medication, Elmer testified, "[H]e would have to. You know, he—he needs to stay focused." When appellant had stayed with Elmer in the past, he had been taking his medication "[a]s far as I know." Elmer testified that, when appellant was with him, appellant was "a good kid" and had never shown any indication that he might want to harm himself.

When asked on cross-examination whether appellant had been suffering from mental illness for the entire time Elmer had known him, Elmer responded, "I—I haven't really seen much of that. When he's with me, he seems straight down on it, you know." Elmer would not allow any drugs in his home and would get appellant to quit smoking. He would watch appellant take his medication and, if he refused to take it, Elmer would make sure he did so. Elmer had never seen appellant act out, but if he had problems, Elmer would take him to seek help. He also would have appellant sign a release so that he could consult with appellant's doctors.

At the conclusion of the trial, the court found appellant gravely disabled. It therefore granted the petition and appointed the public guardian conservator of appellant's person and estate. The court explained that appellant "impresses me as a very

intelligent person.  He seems to have some awareness of mental issues and that he's been aware of them for some time.  He also states his willingness to take medications.  He—he appears to be candid about the existence of the voices that he's hearing.  He doesn't—he seems aware of it—well, he's aware of the voices certainly.  But also seems to be able to distinguish . . . when he's hearing them [*sic*] and doesn't seem to allow them to interfere with his life.  Doesn't seem to be anything in the record that states that the voices are themselves interfering with his abilities.

"However I am concerned based on the testimony of Dr. Holden that even when [appellant] is on his medications that the underlying medical condition interferes with his ability to provide for his food, shelter, and clothing.  I think[] it's a very close case because [appellant] is aware of—has such a strong awareness of his problems and of his medication and so on.  And . . . it seems that he's—he's attempting, not withstanding that, to cope with life and to cope with stressors during his life.  But I think based on . . . the record on which Dr. Holden has relied, that he—he hasn't quite reached that ability to overcome the problem with his mental illness to allow him to provide for his own food, shelter, and clothing.

"I have listened to the testimony of Mr. Elmer, who I think is very sincere in his ability [*sic*] to help his friend [appellant].  But I just don't think that the assurance is there that he will be able to provide the assistance to [appellant] when he needs it. . . .  If Mr. Elmer is going to be at work during all or part of the day, then he's not there to help [appellant] when and if he needs help.  And Mr. Elmer didn't really seem to have developed a plan of how he could help [appellant] when he's not able to take his medication or whether [*sic*] his mental illness perhaps is breaking through or not being controlled by his mental illness [*sic—*medication].

"So I . . . don't think at this time that [appellant] is able to take care of his— provide for his own food, shelter, and clothing.  I think it's a situation where he can, hopefully perhaps soon, I don't know with some additional medication.  I don't know what particular—what would give him that ability.  But I think right now I find he's gravely disabled and unable to take care of his food, shelter, and clothing."

6

Although not mentioned during the trial, in the written order appointing the conservator, the court also imposed special disabilities prohibiting appellant from possessing a driver's license, entering into contracts in excess of $25.00, refusing to consent to treatment related to his grave disability, and possessing any firearm. The court found that the least restrictive appropriate level of placement for appellant was a locked facility.

On July 15, 2015, appellant filed a notice of appeal.

## DISCUSSION

I. *The Sufficiency of the Evidence that Appellant Was Gravely Disabled*

The LPS Act affirms that "[p]ersons with mental illness have the same legal rights and responsibilities guaranteed all other persons by the Federal Constitution and laws and the Constitution and laws of the State of California, unless specifically limited by federal or state law or regulations." (§ 5325.1.) Moreover, "[n]o person may be presumed to be incompetent because he or she has been evaluated or treated for mental disorder . . . , regardless of whether such evaluation or treatment was voluntarily or involuntarily received." (§ 5331; see *In re Qawi* (2004) 32 Cal.4th 1, 17 [" 'one of the cardinal principles of LPS,' [is] 'that mental patients may not be presumed incompetent solely because of their hospitalization' "]; see also § 5000; *Conservatorship of Early* (1983) 35 Cal.3d 244, 253.)

Under the LPS Act, a conservator may be appointed "for a person who is gravely disabled as a result of a mental disorder . . . ." (§ 5350.) "Gravely disabled" is defined as, inter alia, "[a] condition in which a person, as a result of a mental health disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter." (§ 5008, subd. (h)(1)(A).)[2] Under section 5350, subdivision (e)(1), "a person is not

---

[2] A person found gravely disabled under section 5008, subdivision (h)(1)(A), must be placed "in the least restrictive alternative placement, as designated by the court." (§ 5358, subd. (a)(1)(A).) The conservatorship "shall automatically terminate one year after the appointment of the conservator," although, if the conservator determines that an additional period of conservatorship is still required, he or she may petition the trial court for reappointment as conservator for a succeeding one-year period. (§ 5361.)

7

'gravely disabled' if that person can survive safely without involuntary detention with the help of responsible family, friends, or others who are both willing and able to help provide for the person's basic needs for food, clothing, or shelter." "The clear import of the LPS Act is to use the involuntary commitment power of the state sparingly and only for those truly necessary cases where a 'gravely disabled' person is incapable of providing for his basic needs either alone or with help from others. [Citation.]" (*Conservatorship of Smith* (1986) 187 Cal.App.3d 903, 908 (*Smith*).)

In the trial court, "to establish that a person is gravely disabled, the evidence must support an objective finding that the person, due to mental disorder, is incapacitated or rendered unable to carry out the transactions necessary for survival or otherwise provide for his or her basic needs of food, clothing, or shelter," and the public guardian must prove beyond a reasonable doubt that the proposed conservatee is gravely disabled. (*Conservatorship of Carol K.* (2010) 188 Cal.App.4th 123, 134 (*Carol K.*), citing *Smith*, *supra*, 187 Cal.App.3d at p. 909.) On appeal, we apply the substantial evidence test to determine whether the record supports the court's finding of grave disability. The testimony of one witness may be sufficient to support such a finding. (*Conservatorship of Johnson* (1991) 235 Cal.App.3d 693, 697 (*Johnson*).)

In the present case, appellant does not dispute that he suffers from a mental disorder. He contends, however, that the evidence was insufficient to support the trial court's finding that he is gravely disabled as a result. The court found that this was a "very close case" because appellant had "such a strong awareness of his problems and of his medication," including some understanding that the voices he heard were not real; he did not "seem to allow [the voices] to interfere with his life." The court nevertheless concluded that appellant had not "quite reached that ability to overcome the problem with his mental illness to allow him to provide for his own food, shelter, and clothing."

We agree with the court that this is a close case. Had the evidence presented solely addressed appellant's ability to survive safely on his own, without any third party assistance, we may well have concluded the court's ruling was supported by substantial evidence. However, regardless of whether appellant would be gravely disabled if he

8

were on his own, we find that, in light of evidence regarding the offer of third party assistance by appellant's friend, Michael Elmer, the evidence presented at trial was insufficient to demonstrate that appellant could not survive safely in the community. (See § 5350, subd. (e)(1) [person is not gravely disabled if he or she "can survive safely without involuntary detention with the help of responsible family, friends, or others who are both willing and able to help provide for the person's basic needs for food, clothing, or shelter"]; *Johnson*, *supra*, 235 Cal.App.3d at p. 699.)

Appellant cites *Smith*, *supra*, 187 Cal.App.3d 903 in support of his argument that the public guardian did not prove beyond a reasonable doubt that he was gravely disabled. *Smith* involved a proposed conservatee described as suffering "from a mental disorder which commands her to maintain a vigil outside a particular church. At times, she engages in displays of disruptive behavior, interrupting church services. Her fixation on the church results in her sleeping on the sidewalk in front of the church at night, and on one past occasion this may have caused her to become sick." The record revealed, however, that the psychiatrist who testified at trial believed that she received regular offers of help and was able to obtain food, clothing, and shelter. (*Smith*, at p. 910.)

Division Five of this District reversed the trial court's order appointing a conservator, concluding there was insufficient evidence to prove the proposed conservatee was gravely disabled beyond a reasonable doubt because, "[d]espite her admittedly bizarre behavior, she [was] not, nor [had] she been, incapacitated or unable to carry out the transactions necessary to her survival." (*Smith*, *supra*, 187 Cal.App.3d at p. 910.) As the court explained: "Bizarre or eccentric behavior, even if it interferes with a person's normal intercourse with society, does not rise to a level warranting conservatorship except where such behavior renders the individual helpless to fend for herself or destroys her ability to meet those basic needs for survival. Only then does the interest of the state override her individual liberty interests." (*Id*. at p. 909.) The court did note that a more complete record might have demonstrated that the proposed conservatee was in fact gravely disabled, but "the limited testimony adduced at trial"

9

compelled its conclusion that substantial evidence did not support the trial court's finding of grave disability. (*Id*. at p. 910.)

Here, as with the proposed conservatee in *Smith*, no testimony was adduced at trial showing that, due to his mental disorder, appellant "was suffering from malnutrition, overexposure, or any other sign of poor health or neglect." (*Smith*, *supra*, 187 Cal.App.3d at p. 910.) Importantly, even if the evidence showed that appellant could not provide for his basic needs without third party assistance, it did not show that with such help, he would lack the provision of his basic needs for food, clothing, and shelter. (See *id.* at p. 907; § 5350, subd. (e)(1).)

At trial, Dr. Holden testified that appellant told him that he had a friend with whom he wanted to stay. Dr. Holden had then spoken with Elmer, who said he had previous experience helping appellant. Despite his awareness of Elmer's plan to again assist appellant, Dr. Holden testified without explanation that he had not found a "realistic verifiable plan to provide for his own food, shelter, and clothing or the presence of a third person that could assure those things were provided for him." For its part, the court concluded that, while Elmer sincerely wanted to help appellant, there was no assurance "that he will be able to provide the assistance to [appellant] when he needs it." We do not believe substantial evidence supports this conclusion.

As respondent acknowledges, Elmer testified at trial that appellant "could live with him in his home, that he would help appellant with taking his medications, getting a job, buying food, and paying rent."[3] In addition, although Elmer's testimony shows that he was not fully aware of the extent of appellant's mental health and substance abuse issues, he was able to articulate a viable plan for ensuring that appellant took his prescribed medications and refrained from using illegal drugs. Elmer testified that he would stand over appellant to make sure he took his medications twice a day, would buy appellant a watch with an alarm to remind him to take his medications, would drive him

---

[3] Appellant also testified that he received monthly disability payments, which he could use to pay for food and rent.

10

to his appointments with his psychiatrist, and would seek additional medical help for appellant if necessary. Elmer also testified that he would not allow illegal drugs in his home and would lock up his alcohol. In addition, Dr. Holden testified that the reason for his belief that appellant could not provide for his basic survival needs was that appellant "would be very easily taken advantage of." Appellant testified, however, that Elmer— who the court found sincerely wanted to help appellant—had never taken advantage of him in the seven years they had known each other.

The totality of the evidence presented in this case thus did not support the court's finding that appellant was gravely disabled under the LPS Act. On the contrary, the evidence demonstrated that he would be able to "survive safely without involuntary detention with the help of [a] responsible [friend] who [was] both willing and able to help provide for [his] basic needs for food, clothing, or shelter." (§ 5350, subd. (e)(1).)[4]

Respondent nonetheless argues that this case is analogous to *Johnson*, *supra*, 235 Cal.App.3d at pages 698-699, in which the proposed conservatee, who had a history of suicide attempts and noncompliance with medication, alleged that she was not gravely disabled because her mother was willing and able to provide assistance in meeting her basic needs. The appellate court disagreed, finding that the trial court could reasonably conclude that the mother would be unable to provide the kind of structured environment her daughter needed. (*Ibid*.) The mother had six other children in the home and was employed four days a week. She testified that a friend would care for her daughter while she was at work, but there was no evidence that person was qualified to assume such a responsibility. (*Ibid*.) In addition, there were questions about the mother's ability to ensure her daughter's participation in treatment, given the daughter's lack of insight into

---

[4] While Elmer may not have shown that he could manage appellant's mental health symptoms as adeptly as would a person professionally trained to care for someone with a mental disorder, that is not the standard. As appellant states, "[t]he question in a LPS conservatorship case where the proposed conservatee asserts a third party assistance claim is not whether the third party will be able to manage the person's mental health symptoms completely. Rather, the dispositive question is whether the person is able to provide the proposed conservatee with food, clothing, and shelter on a regular basis."

11

her condition and her inconsistent testimony about whether she would take her medication. (*Id*. at pp. 698-699.) Finally, the mother had admitted four months earlier that she was not capable of taking care of her daughter or of meeting her needs and, in fact, the daughter's most recent suicide attempt had occurred while released to her mother's care for a home visit. (*Id*. at p. 699.) The appellate court concluded there was substantial evidence that the support offered by the mother, while well intended, would not satisfy the requirement that a third party's assistance enable a proposed conservatee to "*survive safely*." (*Ibid.*, citing § 5350, subd. (e)(1).)

In this case, the trial court found that appellant had a strong awareness of his mental health issues and medication needs. In addition, Dr. Holden testified that appellant had said that, if released, he would take his medications and meet with his psychiatrist. Elmer also had a plan for ensuring that appellant continued taking his medications and participated in treatment, and was prepared to seek additional help if needed. This evidence distinguishes the present case from *Johnson*, in which the appellate court questioned the mother's ability to ensure her daughter's participation in treatment in light of the daughter's "lack of insight into her condition." (*Johnson*, *supra*, 235 Cal.App.3d at p. 699.) Moreover, the proposed conservatee in *Johnson* had been admitted to the hospital "after a nearly successful suicide attempt" that occurred while she was in her mother's care for a home visit. (*Id*. at p. 697.) Here, although appellant was initially detained pursuant to section 5150 after he was observed on a bridge waving his hands, the only actual evidence offered at trial regarding whether appellant had been threatening suicide was appellant's testimony that he was *not* doing so.[5]

Further distinguishing this case from *Johnson* is the evidence that the mother in that case had six other children at home and had admitted less than four months before

---

[5] Nor was any evidence presented at trial that appellant had been confined in this matter under section 5260, which permits, in certain circumstances, additional confinement and intensive treatment of a person who was initially detained "because he threatened or attempted to take his own life and who continues to present an imminent threat of taking his own life." (§ 5260.)

trial that she was incapable of taking care of appellant or meeting her needs, whereas Elmer had assisted appellant in the past and expressed confidence in his ability to do so again. (See *Johnson*, *supra*, 235 Cal.App.3d at pp. 698-699.) Also, unlike the expert witness in *Johnson*, Dr. Holden did not testify that appellant had failed to cooperate in his treatment during his hospitalization or that he should be in a locked facility due to his need for a " 'structured place that has [a] high level of professional staffing . . . [and] supervision.' " (*Id*. at p. 698.) Nor did the trial court in this case find that appellant's condition was " 'beyond an ordinary person's ability to deal with, . . . [requiring] expert assistance,' " as did the trial court in *Johnson.* (*Ibid*.)

Although it is true that Elmer, like the mother in *Johnson*, worked outside the home, as already discussed, *ante*, there was evidence in *Johnson*, not present in this case, which showed that the proposed conservatee needed a level of assistance and supervision far beyond what her mother could provide. Here, Elmer's employment was just one of the factors to be considered and, given the totality of the evidence presented at trial, was not, on its own, sufficient to support the grave disability finding. Were it otherwise, the offer of assistance by an employed third party would rarely if ever be enough to avoid a finding of grave disability, which would defeat the purpose of section 5350, subdivision (e)(1), and of the LPS Act generally: "to use the involuntary commitment power of the state sparingly and only for those truly necessary cases where a 'gravely disabled' person is incapable of providing for his basic needs either alone or with help from others. [Citation.]" (*Smith*, *supra*, 187 Cal.App.3d at p. 908.)

Because the evidence at trial did not "support an objective finding that [appellant, as a result of his] mental disorder, is incapacitated or rendered unable to carry out the transactions necessary for survival," substantial evidence did not support the trial court's finding that the public guardian had satisfied its burden of proving beyond a reasonable

doubt that, even with Elmer's assistance, appellant would remain gravely disabled. (*Carol K.*, *supra*, 188 Cal.App.4th at p. 134; § 5350, subd. (e)(1).)[6]

Finally, like the appellate court in *Smith*, we recognize the possibility that "[o]ur conclusion might have changed had more extensive testimony on the effect of appellant's behavior on [his] health and well-being been elicited, or [an] investigation properly introduced into evidence been presented." (*Smith*, *supra*, 187 Cal.App.3d at p. 910.)[7] However, in light of the limited evidence adduced at trial on these issues, as well as the evidence that a third party was willing and able to help provide for appellant's basic needs for food, clothing, and shelter, we cannot uphold the court's grave disability finding. (See §§ 5008, subd. (h)(1)(A); 5350, subd. (e)(1).) Respondent and the trial court undoubtedly believed appellant would benefit from many of the services conservatorship provides. We cannot say the belief is unjustified. But that can probably also be said of many for whom conservatorship is unnecessary and never proposed. The benefits of conservatorship can never be considered without also taking into account the

_____

[6] Because we are reversing the conservatorship order, we need not address the second issue raised by appellant: whether substantial evidence supported the trial court's imposition of the special disability denying him the right to refuse treatment related to his grave disability. (See § 5357, subd. (d).) It is worth noting, however, that, although "there is no clear statutory requirement that the court make an express finding of decisional incapacity before imposing the medical treatment disabilities. . . . [Citations.] [T]he record must disclose that the trial court was aware of the finding it was required to make before imposing the disabilities, that it considered the evidence proffered on the issue, and that it in fact made the finding." (*K.G. v. Meredith* (2012) 204 Cal.App.4th 164, 179.) Here, nothing in the record demonstrates that the court considered whether the challenged special disability should be imposed or was even aware of the findings it was required to make before imposing the special disability.

[7] At oral argument, we asked the parties whether the treating psychologist's report, attached to the verified petition, was admitted or admissible at appellant's trial on the issue of his ability to survive safely outside of a conservatorship. We agree with appellant's counsel that, because that report was not admitted into evidence and its author did not testify at trial, any consideration of the report by the trial court would have been improper. (Cf. *Conservatorship of Manton* (1985) 39 Cal.3d 645, 652 [conservatorship investigation report is not admissible at a contested trial on issue of grave disability to extent it contains inadmissible hearsay].)

14

magnitude of the deprivation of liberty it imposes. As our Supreme Court has astutely observed, " ' " [e]xperience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent." ' " (*Conservatorship of Early* (1983) 35 Cal.3d 244, 253)  The threshold and most important question in a case such as this is not whether the proposed conservatee would benefit from conservatorship, but whether, as a practical matter, his or her basic needs for food, clothing, and shelter cannot be met except by imposing some limitation on that person's liberty.  The evidence in this case does not adequately show that to be the case.

## DISPOSITION

The order appointing the public guardian as the conservator of appellant's person and estate is reversed.


_____
Kline, P.J.


We concur:


_____
Stewart, J.


_____
Miller, J.


15

Trial Court:                                      Mendocino County Superior Court

Trial Judge:                                    Hon. Richard Henderson

Attorneys for Objector and Appellant:      Under Appointment by the Court of Appeal
Jeremy T. Price
Jonathan Soglin

Attorneys for Petitioner and Respondent:    Office of the Mendocino County Counsel
Katharine L. Elliott
Acting County Counsel

Rebecca L. Chenoweth
Deputy County Counsel