[S.F. No. 24580. Dec. 22, 1983.]

Conservatorship of the Person and Estate of JOEL PATRICK EARLY.
STEVEN B. PLUMER, as Public Guardian, etc.,
Petitioner and Respondent, v.
JOEL PATRICK EARLY, Objector and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Anna Jovanovich, Deputy State Public Defender, for Objector and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Gregory W. Baugher and Jana L. Tuton, Deputy Attorneys General, for Petitioner and Respondent.

OPINION

THE COURT.—The underlying issue in this case concerns the nature of the evidence which a jury properly may consider in determining whether a person is "gravely disabled" and, therefore, subject to a conservatorship proceeding and possible involuntary confinement under the Lanterman-Petris-Short Act (LPS Act). (Welf. & Inst. Code, § 5000 et seq.; unless otherwise designated, all further statutory references are to that code.)

We will agree with appellant's contention that in determining whether he is "gravely disabled" a jury is entitled to consider the availability of third party assistance to meet a proposed conservatee's basic needs for food, clothing and shelter. Because we also conclude that the thoughtful opinion of Justice Carr of the Court of Appeal for the Third Appellate District in this case thoroughly discusses and correctly analyzes and resolves that issue—along with several subsidiary issues—we adopt substantially all of that opinion as our own. With appropriate deletions and additions,* the Court of Appeal opinion follows:

[The LPS Act provides, inter alia, for emergency and long-range assistance to "gravely disabled" persons.] [] As applicable herein, the LPS Act defines "gravely disabled" as "[a] condition in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing, or shelter; . . ." (§ 5008, subd. (h)(1).)

[Upon application of a peace officer or certain other designated professionals, a person reasonably believed to be gravely disabled may be confined for treatment and evaluation for 72 hours in facilities designated by the county and approved by the State Department of Mental Health. (§§ 5150, 5151.) If the result of the evaluation is to confirm that the person is gravely disabled, he may be confined for intensive treatment in certain designated facilities for no more than 14 days; such confinement is authorized only upon certification to the necessity therefor by a physician or psychologist and by another professional—at least one of whom personally participated in the evaluation—and only if the person evaluated is unable or unwilling to accept treatment voluntarily. (§§ 5250-5252.) During that 14-day period, the person so certified is entitled to prompt administrative and judicial review to determine the existence of probable cause for the confinement, with notice to appropriate parties to facilitate that review. (§ 5253 et seq.) In the absence of an interim application for judicial review, the certification is reviewed automatically at a hearing to be held within seven days of the initial detention. (§ 5256.)

When the necessity for a more lengthy confinement to provide individualized treatment, supervision, and placement is indicated, the superior court may establish a temporary conservatorship for a period of not more than 30 days. (§§ 5350.1, 5352.1.) Such necessity may be demonstrated either by the affidavit of the professional in charge of the initial evaluation or of the intensive treatment or by the comprehensive report of an officer

---

*Brackets together, in this manner [], are used to indicate deletions from the opinion of the Court of Appeal; brackets enclosing material (other than the editor's parallel citations) are, unless otherwise indicated, used to denote insertions or additions by this court. (*Estate of McDill* (1975) 14 Cal.3d 831, 834 [122 Cal.Rptr. 754, 537 P.2d 874].)

providing conservatorship investigation. (§§ 5352, 5352.1.) The latter comprehensive report, which also may form the basis for a more extended conservatorship, must contain "all relevant aspects of the person's medical, psychological, financial, family, vocational and social condition, and information obtained from the person's family members, close friends, social worker or principal therapist." (§ 5354.)

The investigating officer providing the comprehensive report may recommend an extended conservatorship "only if no suitable alternatives are available." (*Ibid.*) If such a conservatorship is recommended, the proposed conservatee is entitled to a jury trial on the issue of whether he is gravely disabled. (§ 5350, subd. (d).) ■ A conservatorship may be established only if the jury finds such grave disability unanimously and beyond a reasonable doubt. (*Conservatorship of Roulet* (1979) 23 Cal.3d 219, 225-226, 230 [152 Cal.Rptr. 425, 590 P.2d 1].)

If the jury determines that the proposed conservatee is gravely disabled, the court is authorized to appoint a conservator and to determine the scope of his powers (§§ 5350, 5357) and must hold a hearing to determine the appropriate placement of the conservatee. (§ 5358.) The conservatee has the right to the least restrictive placement suitable for his circumstances, as designated by the court. (*Ibid.*) A conservatorship so established automatically terminates one year after it is created and can be reestablished only by commencing new conservatorship proceedings in the superior court. (§ 5361.)]

[In the matter before us] the conservatee appeals from the judgment and order of conservatorship after a jury found him to be "gravely disabled" (§ 5358), contending reversible error in the refusal of the trial court to admit evidence of the availability of the help of family and friends to assist appellant in meeting his basic needs and the failure to instruct that a person is not gravely disabled if he can meet his basic needs with the assistance of others. In addition, appellant asserts the district attorney may not serve as public guardian [because] the offices are incompatible; that the conservatorship report was inadequate; that the trial court erred [in] refusing the conservatee's proposed instructions that an atypical lifestyle does not constitute a grave disability[;] and that a person is not gravely disabled if he voluntarily accepts treatment but the proposed treatment plan was and is inadequate.

We conclude [that] the trial court's failure to admit evidence of and to instruct on the availability of assistance of others to meet the basic needs of a person afflicted with a mental disorder was prejudicially erroneous requiring reversal.

We do not infer, imply or determine that given a full presentation of the facts and proper instructions, appellant herein would be found by the triers of fact to be outside the purview of the LPS Act, that is, not gravely disabled. We determine only that evidence of available assistance by family members or friends which will enable one suffering from a mental disorder to meet his or her basic needs for food, clothing and shelter is admissible and that proffered instructions on this issue when tendered by the evidence must be given.

Factually, the record discloses that during the summer of 1981 [appellant] lived in Yreka, apparently in the back yard of his sister's house. He frequently wandered about town in a dirty, disheveled and odoriferous condition. He was seen by the coordinator of the county mental health department in an effort to arrange for shelter and by the staff of Siskiyou General Hospital for treatment of infections caused by his dirty and urine-soaked clothing. On September 15, 1981, appellant was admitted to the hospital and a conservatorship referral was made. The psychiatrists who examined [appellant] concurred in a diagnosis of schizophrenia and [concluded] that his incontinence was due to his mental condition. There was agreement that [appellant] was not capable of caring for his medical or mental problems himself, particularly as he refused voluntary treatment with psychotropic medication.

At trial on the issue of whether appellant was gravely disabled appellant's counsel sought to introduce evidence that appellant could meet his needs for food, clothing and shelter with the assistance of family and friends. Also proposed were two jury instructions directing the jury to find [appellant] was not gravely disabled if he was able to provide for his basic personal needs with the assistance of willing and responsible family or friends.[1] Both requests were denied.

The issue tendered by the proffered evidence and instructions has been considered by three other districts of the Courts of Appeal, with disparate

---

[1] Appellant's proposed instructions were as follows:

Proposed instruction No. 4 read:

"The term 'gravely disabled' refers to a legal, not a medical disability. It is a survival disfunction and is measured by functional inabilities pertaining to the providing of basic personal needs for food, clothing or shelter.

"A person is gravely disabled if, as a result of a mental disorder, he is unable to provide for his basic personal needs for food, clothing or shelter.

"A person is not gravely disabled if he is able to survive on his own, or if he is able to enlist the aid of willing and responsible third parties in providing for his basic personal needs for food, clothing and shelter."

Proposed instruction No. 7 read: "You are instructed that if you find Joel Patrick Early is capable of surviving in freedom by himself or with the help of willing and responsible family members or friends you shall find that he is not gravely disabled."

rulings. In *Conservatorship of Buchanan* (1978) 78 Cal.App.3d 281, 289 [144 Cal.Rptr. 241], the First Appellate District held "the pertinent inquiry on the issue of grave disability is whether the conservatee *himself* is able to provide for his basic needs and not, as Buchanan maintains, whether he can do so with the assistance of third parties." (Original italics.) The court reasoned the LPS Act had separated the adjudication of [being] gravely disabled from the consideration of treatment [therefor] and to allow the jury to consider the willingness and ability of third persons to care for the conservatee would not only confuse the jury but intrude on the power of the trial court to determine the course of treatment. (P. 290.)

In *Conservatorship of Davis* (1981) 124 Cal.App.3d 313, 321 [177 Cal.Rptr. 369], the Second Appellate District disagreed with *Buchanan* and concluded "a person is not 'gravely disabled' within the meaning of section 5008, subdivision (h)(1) if he or she is capable of surviving safely in freedom with the help of willing and responsible family members, friends or third parties." The *Davis* court examined the LPS Act and found no indication that evidence of third party help was to be excluded from the jury's consideration. (P. 323.) The court reasoned the intent of the [LPS Act] was to allow the jury to determine whether a conservatorship is necessary in light of all the relevant facts, and to limit the jury to the sole issue of whether the person was able to provide his basic personal needs unaided by others would seriously infringe on the conservatee's due process rights. (Pp. 323-324.) It was stated "[t]he legislative focus of the LPS Act is on protecting the nondangerous gravely disabled person and allowing that person to live safely in freedom or the least restrictive alternative if he or she can do so, with or without the aid of appropriate others; it is not to force the person proposed for conservatorship to pass a theoretical test of ability to survive and provide necessities alone where there are in fact willing responsible family, friends and others ready to help." (P. 326.)

The conclusion reached in *Davis* was recently adopted by *Conservatorship of Wilson* (1982) 137 Cal.App.3d 132 [186 Cal.Rptr. 748]. In *Wilson,* the Fourth Appellate District held it was error to instruct the jury the person is gravely disabled if he or she is unable, " '*unassisted,*' " to provide for his or her basic personal needs. (P. 134, italics added.) The court cited *Davis* and added that in modern society no one lives completely independently of everyone and everything. It was therefore too much to ask a proposed conservatee to do so. (P. 136.)

■ We are in accord with *Davis* and *Wilson.* One of the stated purposes of the LPS Act is "[t]o end the inappropriate, indefinite, and involuntary commitment of mentally disordered persons . . . and to eliminate legal disabilities." (§ 5001, subd. (a).) To this end, the law must "strive to make

certain . . . only those truly unable to take care of themselves are being assigned conservators under the LPS Act and committed to mental hospitals against their will." (*Roulet, supra,* 23 Cal.3d at p. 225.) We agree with *Wilson* that it is unreasonable to force the conservatee to prove he or she is capable of an entirely independent existence and suggest there are few members of the general public who are capable of such an existence.[2] We all depend, to varying degrees on the assistance of others (e.g., parents, mechanics, the farmer, the tailor) to make our way in the world. Where willing and responsible others are able to assist a person in providing his or her basic personal needs the person is not, in our view, "truly unable to take care of [himself or herself]." (*Id.,* at p. 225.) Moreover, in such a situation the necessity of state intervention as a provider of these basic needs is reduced, thereby fulfilling another purpose of the LPS Act, "to prevent duplication of services and *unnecessary expenditures.*" (§ 5001, subd. (f), italics added.)

The state has no greater interest in involuntarily confining a mentally disturbed person who can care for basic needs with the assistance of willing and able third persons than it has in confining a physically handicapped or aged person who requires the assistance of friends or relatives to meet such needs. This issue was forcefully highlighted in *O'Connor* v. *Donaldson* (1975) 422 U.S. 563 [45 L.Ed.2d 396, 95 S.Ct. 2486], wherein Donaldson had been civilly committed for nearly 15 years, without any program designed to alleviate or cure his alleged illness. (Pp. 567-569 [45 L.Ed.2d at pp. 402-403].) The court questioned: "May the State confine the mentally ill merely to ensure them a living standard superior to that they enjoy in the private community? That the State has a proper interest in providing care and assistance to the unfortunate goes without saying. But the mere presence of mental illness does not disqualify a person from preferring his home to the comforts of an institution. Moreover, while the State may arguably confine a person to save him from harm, incarceration is rarely if ever a necessary condition for raising the living standards of those capable of surviving safely in freedom, on their own or with the help of family or friends." (P. 575 [45 L.Ed.2d at p. 407].) The court held "[i]n short, a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing

---

[2]The jury in the present case was instructed in accord with *Buchanan* [78 Cal.App.3d 281] as follows: "The ability to provide for these basic needs requires more than the physical and mechanical ability to do certain acts; *it means that the person be able to function and maintain himself without the assistance of other available resources.* However, he need not necessarily be financially capable of self-support; he need only be aware of the social services and resources available to him, and capable of applying any income he receives, regardless of source, to provide for his basic personal needs." (Italics added.)

and responsible family members or friends." (P. 576 [45 L.Ed.2d at p. 407].)

*Buchanan* summarily rejected the persuasive force of *O'Connor* v. *Donaldson* in the present context [because] *O'Connor* did not involve the state's power to confine an individual for *treatment.* (*Buchanan, supra,* 78 Cal.App.3d at p. 291.) We disagree with *Buchanan* and conclude *O'Connor* is persuasive for two reasons. First, as we previously noted, there is no necessity of state intervention, even to provide treatment, where care can be provided through the good offices of family or friends. Second, we believe *O'Connor* has been implicitly incorporated in the [structure of the LPS Act] by statutory amendment.

Section 5350 provides in part: "The procedure for establishing, administering and terminating conservatorship under this chapter shall be the same as that provided in Division 5 (commencing with Section 1701) of the Probate Code . . . ." Present section 1801, subdivision (a) of the Probate Code, substantially in accord with Welfare and Institutions Code section 5008, subdivision (h), provides in part: "A conservator of the person may be appointed for a person who is unable properly to provide for his or her personal needs for physical health, food, clothing, or shelter . . . ." The section from which this statute was derived allowed a conservatorship to be imposed if, for enumerated reasons, the person *"is unable properly to care for himself . . . ."* (Former Prob. Code, § 1751, added Stats. 1957, ch. 1902, p. 3307, italics added.) We perceive the distinction between *caring for oneself* and *providing for one's needs* to be both significant and intentional, a perception reinforced by an amendment to former Probate Code section 1460. That section provided for a guardianship to be imposed upon a person, who for various reasons is "unable, *unassisted,* to properly manage and take care of himself . . . ." (Added by Stats. 1891, ch. 76, § 1, p. 68, italics added.) The parallel to former Probate Code section 1751, *supra,* is apparent. In 1976, the section was amended to delete the word *"unassisted"* (see Stats. 1976, ch. 1357, § 5, p. 6182). Commentators recognized this change was in direct response to the 1975 decision in *O'Connor* v. *Donaldson [supra,* 422 U.S. 563]. (See Alexander, *On Being Imposed Upon By Artful Or Designing Persons—The California Experience With The Involuntary Placement Of The Aged* (1977) 14 San Diego L.Rev. 1083, 1095.) We similarly conclude it represents a legislative recognition that trial courts must examine the willingness and ability of third persons to assist the proposed ward or conservatee before imposing an involuntary confinement under the Probate Code. Section 5350 imports this reasoning to the conservatorship provisions of the Welfare and Institutions Code.

Nor do we agree, as expostulated in *Buchanan, supra,* 78 Cal.App.3d 281, that allowing the jury to hear evidence of third persons' willingness to

assist the proposed conservatee will confuse the jury or infringe on the trial court's power to choose the course of treatment. That issues to be tried are complicated or fraught with problems does not reduce the appellant's right to a trial by jury. (*Paularena* v. *Superior Court* (1965) 231 Cal.App.2d 906, 914 [42 Cal.Rptr. 366].) "A juror is not some kind of dithering nincompoop, brought in from never-never land and exposed to the harsh realities of life for the first time in the jury box." (*People* v. *Long* (1974) 38 Cal.App.3d 680, 689 [113 Cal.Rptr. 530].) Jurors are presumed to be intelligent, capable of understanding instructions and applying them to the facts of the case. (*Henderson* v. *Los Angeles Traction Co.* (1907) 150 Cal. 689, 697 [89 P. 976].) Certainly a jury is capable of properly assessing the evidence of actual or potential assistance by third persons in determining whether a proposed conservatee is gravely disabled. Nor does the admission of this evidence limit in any way the trial court's options in choosing a plan of treatment if the jury determines the person is gravely disabled. The same range of placement options [is] available, including placement with family or friends. (§ 5358.)

We agree with respondent that the primary purpose of the LPS Act is to protect the mentally disordered person (§ 5001, subd. (g)), but we do not agree this protection must in all cases be provided by a state appointed conservator. As [we] noted in *Conservatorship of Roulet, supra,* 23 Cal.3d at page 225, "'[e]xperience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding.' (*Olmstead* v. *United States* (1928) 277 U.S. 438, 479 [72 L.Ed. 944, 957, 48 S.Ct. 564, 66 A.L.R. 376] (dis. opn. of Brandeis, J.).)" The purpose of protecting the mentally disordered person must be read in concert with the purpose of ending the *inappropriate, indefinite* and *involuntary* commitment of such persons. (§ 5001, subd. (a).) The two purposes can be achieved by avoiding inappropriate commitment of a mentally disordered person where there are those willing and able to provide the protection required. This does not presage, as respondent contends, "a return to the appalling conditions at the turn of the century, when mentally ill persons were locked in attics and upstairs rooms."

As we view the broad purpose of the LPS Act, imposition of a conservatorship should be made only in situations where it is truly necessary. To accomplish this purpose evidence of the availability of third party assistance must be considered. (*Roulet, supra,* 23 Cal.3d at p. 225; *Davis, supra,* 124 Cal.App.3d at p. 323.)

[We do not agree with respondent's contention that the availability of third party assistance should not be considered by the trier of fact, because that assistance may not continue to be available forever. In the event such assistance is withdrawn after it has been utilized in the determination that a prospective conservatee is not gravely disabled, such change of circumstances clearly would justify new proceedings for reappraisal of such person's condition. Further, we consider unwarranted the concern that the precipitous withdrawal of necessary third party assistance might deprive a gravely disabled person of basic necessities. The statutory scheme for short-term emergency confinements discussed heretofore (see §§ 5150, 5250, 5352.1) provides ample means to fulfill those needs pending formal conservatorship proceedings.]

We conclude [that] the definition of the phrase "gravely disabled" as a condition in which the person is "unable to provide for his basic personal needs for food, clothing, or shelter . . ." (§ 5008, subd. (h)(1)) was intended to encompass a consideration of whether the person could provide these basic needs with or without the assistance of willing and responsible family members, friends, or other third parties. (*Davis, supra,* [124 Cal.App.3d] at p. 325.) [We readily acknowledge, however, that the burden of proving grave disability so defined could well become insuperable if those alleging such disability had to negate all reasonable doubts as to the possible existence of third party aid. (See *Roulet, supra,* 23 Cal.3d at pp. 225-226.) It would be particularly ironic to impose the frequently impossible duty of proving a negative (here, the nonexistence of third party aid) where the consequence of a failure of such proof could well deny care to a person whose need therefor may be demonstrated clearly or convincingly, but not beyond a reasonable doubt. In the absence of evidence that third party assistance *might* be available, allowing speculation as to that availability by the trier of fact to defeat a finding of grave disability would contravene the purposes of the LPS Act in this context. Knowledge of the availability of third party assistance normally would be in the possession of the proposed conservatee or of those acting on his or her behalf. However, they are not necessarily the exclusive sources of such information, and we see no need to cast the burden of adducing evidence of third party assistance on any particular party to these proceedings. Rather, we hold only that the trier of fact on the issue of grave disability must consider the availability of third party assistance to meet the basic needs of the proposed conservatee for food, clothing or shelter only if credible evidence of such assistance is adduced from any source at the trial of the issue. If the fact-finder is a jury, it must be so instructed under these circumstances if so requested by the proposed conservatee.

Accordingly,] it was error to instruct the jury the appellant was not gravely disabled only if appellant had the ability to provide for his basic needs

without the assistance of other available resources. Conversely, the trial court erred in refusing to allow appellant to present evidence that he could survive safely in freedom with the help of willing and responsible family members or friends and in refusing appellant's proposed instruction to that effect. Without the evidence of potential assistance to appellant by willing and responsible others, and proper jury instructions on the significance of this evidence in making the determination of "gravely disabled," it is impossible to know what the jury's conclusion would have been. The court's error was not harmless beyond a reasonable doubt. (*Wilson, supra,* 137 Cal.App.3d at pp. 135-136.) [On the foregoing reasoning, *Buchanan, supra,* 78 Cal.App.3d 281, is disapproved.]

■ Appellant also contends it was error to appoint the Public Guardian of Siskiyou County as conservator for appellant [because] both this office and the office of the district attorney are held by the same individual. Appellant urges the offices are incompatible and the order appointing the public guardian must be vacated. We disagree.

The offices of public guardian and district attorney are not *inherently* incompatible. (34 Ops.Cal.Atty. Gen. 50, 51 (1959).) A potential for conflict exists in the situation where a ward or conservatee is accused of a criminal offense, but this conflict can be avoided by recusing the district attorney from the case. (See Pen. Code, § 1130.) Moreover, the Legislature has implicitly sanctioned the combination of the two offices by allowing counties to combine the offices of public administrator and public guardian (§ 8001) and to combine the offices of district attorney and public administrator. (Gov. Code, § 24300, subd. (1).) The appointment of the public guardian as conservator in this case was not error.

■ Appellant urges it was error to appoint a permanent conservator before trial. We disagree with appellant's characterization of the appointment. The court appointed a conservator, *pending the outcome of the trial.* In substance, this was a temporary conservatorship which was well within the authority of the court. (§ 5352.1.) If appellant objected to this procedure or the adequacy of the conservatorship investigation he could have challenged the court's actions by writ of habeas corpus prior to trial. (§ 5275.) He chose not to do so, and the jury, without being informed a temporary conservatorship had been imposed, found him gravely disabled. Any harm arising from appellant's asserted errors was thereby rendered harmless. []

■ Appellant contends the trial court erred in refusing his instruction that he was not gravely disabled if he voluntarily accepted treatment. [] [The instruction requested, however, had] no basis in [] the record. Appellant consistently *refused* treatment for his mental disorder. That he allowed

hospital staff to bathe him and treat his wounds does not mean he voluntarily accepted treatment in the sense intended. (§ 5352.) [] [Accordingly, we have no occasion to decide the legal issue asserted.]

Respondent concedes the treatment plan proposed for appellant was inadequate. This problem can be remedied following retrial, if necessary, when a new treatment plan will be proposed. (§ 5352.6.) [Fn. omitted.] (End of Court of Appeal opinion.)

The judgment is reversed and the matter remanded to the trial court for further proceedings consistent with this opinion.