# IN THE SUPREME COURT OF CALIFORNIA

Conservatorship of the Person and Estate of K.P.

---

PUBLIC GUARDIAN OF LOS ANGELES,
as Conservator, etc.,
Petitioner and Respondent,
v.
K.P.,
Objector and Appellant.

S258212

Second Appellate District, Division Two
B291510

Los Angeles County Superior Court
ZE032603

---

June 28, 2021

Justice Corrigan authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Liu, Cuéllar, Kruger, Groban, and Jenkins concurred.

---

Conservatorship of K.P.

S258212

Opinion of the Court by Corrigan, J.

The Lanterman-Petris-Short Act (LPS Act or Act; Welf. & Inst. Code, § 5000 et seq.)[1] provides one-year conservatorships for those "gravely disabled as a result of a mental health disorder or impairment by chronic alcoholism." (§ 5350.)[2] Those subject to a conservatorship petition are entitled to a court or jury trial to decide if they are "gravely disabled." (§ 5350, subd. (d)(1).) The question here is whether the trier of fact must find, in addition, that the individual is unwilling or unable to voluntarily accept treatment. This is an issue of statutory interpretation on which the Courts of Appeal have differed. We granted review to resolve the conflict and now hold that capacity or willingness to accept treatment is a relevant factor to be considered on the issue of grave disability but is not a separate element that must be proven to establish a conservatorship.

## I. BACKGROUND

The Los Angeles County Superior Court established a conservatorship for 23-year-old K.P. in May 2008 and renewed it annually over the next nine years. In April 2018, the county's public guardian (Public Guardian) filed another renewal

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] Because this case involves only mental disorders, we generally dispense with further mention of chronic alcoholism.

1

petition, alleging K.P. remained gravely disabled. This time, K.P. demanded a jury trial.

A psychologist from K.P.'s residential facility testified that he suffered from schizophrenia, with auditory hallucinations and paranoid delusions. For example, on the morning of trial he asked to enter a witness protection program because he believed a fellow resident was planning to attack him. In another incident, K.P. chased and threatened someone he believed had intentionally hit him with a basketball. He could not be redirected and was hospitalized. K.P. also displayed "grossly disorganized behaviors," lack of motivation, and difficulty speaking and socializing. The psychologist concluded K.P. lacked significant insight into his disorder. He minimized his symptoms and believed they were caused by medications. His mother had expressed the same belief. K.P. resisted taking his prescriptions or participating in therapy and other services. The psychologist concluded K.P. could not provide for his basic needs without medication and did not believe he would take them consistently or correctly without a conservator's supervision. The day before trial, K.P. almost gave himself a double dose of one potentially toxic pharmaceutical. The psychologist believed K.P. needed round-the-clock supervision and lacked the initiative and insight necessary to obtain treatment himself. Although he had opportunities to do so, K.P. had never left the facility without his therapist or mother.

K.P.'s mother understood that he had a mental illness. If he were released from the conservatorship, she testified that she would help him take his medications and attend therapy appointments. She could not provide housing but would help him find a place to live.

K.P. also testified. He had not lived outside a hospital or treatment facility since 2013. After some conflicting answers, he agreed to stay in his current placement until he could find a place to live. K.P.'s mother had previously been his conservator but later became homeless and moved away. K.P. agreed he needed a psychiatrist and said he would see a therapist if released, but he denied having any mental illness. He thought his problems might stem from a childhood brain injury. K.P. asserted he did better without his psychiatric drugs and said he would not take them if released from the conservatorship. To supplement his Social Security benefits, K.P. planned to become an entrepreneur.

The court gave two Judicial Council of California Civil Jury Instructions (CACI) relevant to the issue here. CACI No. 4000, as given, stated: "The Office of the Public Guardian claims that [K.P.] is gravely disabled due to a mental disorder and therefore should be placed in a conservatorship. In a conservatorship, a conservator is appointed to oversee, under the direction of the court, the care of persons who are gravely disabled due to a mental disorder. To succeed on this claim, the Office of the Public Guardian must prove beyond a reasonable doubt all of the following: [¶] (1) That [K.P.] has a mental disorder; and [¶] (2) That [K.P.] is gravely disabled as a result of the mental disorder."

CACI No. 4002, as given, explained the meaning of "gravely disabled": "The term 'gravely disabled' means that a person is presently unable to provide for his or her basic needs for food, clothing, or shelter because of a mental disorder. [¶] Psychosis, bizarre or eccentric behavior, delusions or hallucinations are not enough, by themselves, to find that [K.P.] is gravely disabled. He must be unable to provide for the basic

needs of food, clothing, or shelter because of a mental disorder. [¶] If you find [K.P.] will not take his prescribed medication without supervision and that a mental disorder makes him unable to provide for his basic needs for food, clothing, or shelter without such medication, then you may conclude [K.P.] is presently gravely disabled. [¶] In determining whether [K.P.] is presently gravely disabled, you may consider evidence that he did not take prescribed medication in the past. You may consider evidence of his lack of insight into his medical condition. [¶] In determining whether [K.P.] is presently gravely disabled, you may not consider the likelihood of future deterioration or relapse of a condition. [¶] *In determining whether [K.P.] is presently gravely disabled, you may consider whether he is unable or unwilling voluntarily to accept meaningful treatment.*" (Italics added.)

K.P. requested a modification of CACI No. 4000 to require, as a separate element, a finding that he was "unwilling or unable voluntarily to accept meaningful treatment." He argued the final sentence of CACI No. 4002 directing the jury's attention to this issue was inadequate because it was "thrown in at the bottom of [a] less consequential later jury instruction." The court denied the request, observing that resistance to voluntary treatment is appropriately *considered* as an aspect of grave disability but is not a separately required element that must be proven.

The jury found that K.P. was gravely disabled, and the reappointment petition was granted. On appeal, K.P. challenged the refusal to modify CACI No. 4000. The Court of

Appeal concluded there was no error. We granted review and now reach the same conclusion.[3]

## II.  DISCUSSION

Although couched as a complaint about jury instructions, K.P. essentially claims that a finding of unwillingness or inability to accept voluntary treatment is required for a conservatorship to be established. This is a legal question subject to de novo review. (*John L.*, *supra*, 48 Cal.4th at p. 142; see *Conservatorship of P.D.* (2018) 21 Cal.App.5th 1163, 1167.) Our goal in construing the LPS Act is to effectuate the Legislature's intent. (*John L.*, at p. 143.) We consider individual statutes in the context of the entire Act so that each part may be harmonized and given effect. (See *Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230; *Conservatorship of Joseph W.* (2011) 199 Cal.App.4th 953, 963.)

### A.    *Overview of the LPS Act*

The LPS Act has many purposes, including "end[ing] the inappropriate, indefinite, and involuntary commitment of persons with mental health disorders" (§ 5001, subd. (a)), "provid[ing] prompt evaluation and treatment" (*id.*, subd. (b)), and "provid[ing] individualized treatment, supervision, and

---

[3]    The conservatorship challenged here ended, rendering the appeal technically moot. This problem frequently arises because a conservatorship's duration is short, compared to the appellate process. (See, e.g., *Conservatorship of John L.* (2010) 48 Cal.4th 131, 142, fn. 2 (*John L.*).) The Court of Appeal concluded the issue K.P. raises is capable of repetition but likely to evade review. (*Conservatorship of K.P.* (2019) 39 Cal.App.5th 254, 257, fn. 2; see *Conservatorship of David L.* (2008) 164 Cal.App.4th 701, 709.) We agree and elect to decide this otherwise moot appeal.

placement services by a conservatorship program" (*id.*, subd. (e)). The Act defines persons as " 'gravely disabled' " if they are unable to provide for basic personal needs of food, clothing, or shelter, as a result of a mental disorder. (§ 5008, subd. (h)(1)(A); see § 5350, subd. (e).)

The overall statutory scheme describes a detailed, calibrated system for intervention when circumstances indicate a person may be suffering from a mental health disorder. In addition to conservatorships, the Act permits 3-day, 14-day, and 30-day involuntary detentions for intensive treatment.[4]

1. *Chapter 2: Involuntary Detentions*

Under chapter 2 of the Act, those gravely disabled by a mental health disorder may be held for up to 72 hours for evaluation and treatment. (§ 5150, subd. (a).) Before such a detention can begin, a professional must assess whether the person "can be properly served without being detained." (*Id.*, subd. (c).) In such a case, services must be provided "on a voluntary basis." (*Ibid.*) After 72 hours, the person may be detained for up to 14 days of intensive treatment if three conditions are met: (1) a professional has found that the person is gravely disabled due to a mental health disorder (§ 5250, subd. (a)); (2) the facility providing treatment agrees to admit the person (*id.*, subd. (b)); and (3) the person "has been advised of the need for, but has not been willing or able to accept, treatment on a voluntary basis" (*id.*, subd. (c)). This 14-day

---

[4] Our discussion is confined to the provisions for persons gravely disabled due to a mental health disorder, but such detentions are also available for individuals who are imminently dangerous to themselves or others, or are impaired by chronic alcoholism. (See §§ 5150, 5250, 5260, 5300.)

period can be extended by up to 30 days if the professional staff finds that the person remains both gravely disabled and "unwilling or unable to accept treatment voluntarily." (§ 5270.15, subd. (a)(2).)

Someone certified for a 14-day or 30-day detention has the right to a prompt certification review hearing. (§§ 5254, 5256, 5270.15, subd. (b).) The only question to be decided at such a review hearing is whether the person is gravely disabled by a mental health disorder (see § 5256.5). If there is insufficient probable cause to find grave disability, the person must be released. (§§ 5256.5–5256.6.)[5]

As an alternative to a certification review hearing, those detained have the right to habeas corpus review. (§ 5275.) Unlike a review hearing, habeas review tests *all* the initial certification requirements. The court must order an immediate release if it finds that the detained person is not gravely disabled, or "had not been advised of, or had accepted, voluntary treatment," or that the facility is not designated by the county or is not equipped and staffed to provide intensive treatment. (§ 5276, 2d par.) These statutes apply only to chapter 2 detentions, however, and not chapter 3's more lengthy conservatorships. Although habeas corpus relief may be appropriate "in extraordinary circumstances" (*In re Gandolfo* (1984) 36 Cal.3d 889, 899), ordinarily the statutory rehearing provisions (§ 5364; see also § 5358.3) and the right to appeal

---

[5] Release is also required at the end of an involuntary detention period, unless the gravely disabled person is certified for an additional 14 or 30 days of intensive treatment, is the subject of a petition for conservatorship or confinement of a dangerous person (see § 5300), or agrees to receive treatment voluntarily. (§ 5257, subd. (b).)

from a conservator's appointment or reappointment provide available and adequate remedies for aggrieved conservatees. (*Gandolfo*, at pp. 898–900; see *Michelle K. v. Superior Court* (2013) 221 Cal.App.4th 409, 433; 6 Witkin & Epstein, Cal. Criminal Law (4th ed. 2020) Criminal Writs, § 25, pp. 630–631.)

   2.   *Chapter 3:  Conservatorships*

Chapter 3 of the Act goes on to provide for the imposition of a conservatorship under specifically described circumstances. A "series of temporary detentions may culminate in a proceeding to determine whether the person is so disabled that he or she should be involuntarily confined for up to one year. (§§ 5350, 5361.)   Because of the important liberty interests at stake, correspondingly powerful safeguards protect against erroneous findings." (*Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 541 (*Ben C.*).)   Conservatorships can involve confinement and other "disabilities" that may be imposed by the court, such as the loss of driving privileges, the right to enter contracts or vote, and the right to refuse medical and other treatments.  (§ 5357.)

Section 5352 sets out the requirements for a professional recommendation to initiate conservatorship proceedings.  The first paragraph of section 5352 addresses recommendations for individuals who have already been detained for evaluation and treatment under chapter 2.  When the professional in charge of an agency providing comprehensive evaluation, or of a facility providing intensive treatment, "determines that a person in his or her care is gravely disabled as a result of mental disorder or impairment by chronic alcoholism *and is unwilling to accept, or incapable of accepting, treatment voluntarily*, he or she may recommend conservatorship to the officer providing conservatorship investigation of the county of residence of the

person prior to his or her admission as a patient in such facility." (§ 5352, 1st par., italics added.)[6]  Thus, before a professional may *recommend* the initiation of a conservatorship for a detained inpatient, that professional must conclude the person is not willing or able to consent to voluntary treatment.  This requirement recognizes that if a person is able and willing to accept inpatient treatment, there may be no need to pursue the additional constraints of a conservatorship.  It also recognizes that when a person is committed for inpatient treatment, but unwilling or unable to consent to that treatment, an additional measure of authority over the person may be necessary for treatment to be successful and for other services, like general medical care, to be provided.

The recommendation standards are different for those presently receiving outpatient treatment, however.  The second paragraph of section 5352, which addresses outpatients, does not mention a willingness or ability to accept treatment.  Under that paragraph, the professional agency in charge of "providing comprehensive evaluation or a facility providing intensive treatment, or the professional person in charge of providing mental health treatment at a county jail, or his or her designee, may recommend conservatorship for a person without the person being an inpatient in a facility providing comprehensive evaluation or intensive treatment, if both of the following conditions are met:  (a) the professional person[,] or another professional person designated by him or her[,] has examined and evaluated the person and determined that he or she is

---

[6]  These requirements also apply when conservatorship is considered for someone who is already subject to a Probate Code conservatorship.  (§ 5350.5, subd. (a).)

gravely disabled; (b) the professional person or [designee] has determined that future examination on an inpatient basis is not necessary for a determination that the person is gravely disabled."[7] The distinction between the two paragraphs reflects that those not in a county jail are entitled to remain on outpatient status if services can be effectively provided on a voluntary basis (see §§ 5150, subd. (c) [72-hour period], 5250, subd. (c) [14-day period], 5270.15, subd. (b) [30-day period]), even when a conservatorship is necessary.[8]

Under either paragraph of section 5352, the professional's recommendation simply starts the conservatorship process. If the county's investigative office agrees with the recommendation, it initiates court proceedings. (§ 5352.) The county then conducts a comprehensive investigation of available alternatives to conservatorship, examining "all relevant aspects of the person's medical, psychological, financial, family,

---

[7] If an inpatient placement is necessary for a proper determination of grave disability, the detention process under chapter 2 may be initiated.

[8] K.P. offers a different reading of section 5352. He asserts the statute's second paragraph merely provides an alternate mechanism for outpatient recommendations and does not alter the substantive standards set forth in the first paragraph. In particular, he contends the first paragraph's requirements should be incorporated into the second paragraph. This interpretation is contradicted by the statutory language, which clearly establishes only two requirements for an outpatient recommendation and does not reference or incorporate the first paragraph's inpatient recommendation requirements. More importantly, as will be discussed, nothing in section 5352 evinces a legislative intent to incorporate the guidelines for a treatment provider's *initiation* of conservatorship proceedings into the factual findings required to impose a conservatorship.

vocational, and social condition, and information obtained from the person's family members, close friends, social worker, or principal therapist." (§ 5354, subd. (a).) After this investigation, the county is empowered to "recommend conservatorship to the court only if no suitable alternatives are available." (*Ibid*.) A conservator may then be appointed if the person is found to be gravely disabled as a result of a mental health disorder. (§ 5350.)

Proposed conservatees have the right to a jury trial to determine whether they are gravely disabled. (§ 5350, subd. (d)(1).) The determination must be unanimous and upon proof beyond a reasonable doubt. (*Conservatorship of Early* (1983) 35 Cal.3d 244, 248 (*Early*); *Conservatorship of Roulet* (1979) 23 Cal.3d 219, 235 (*Roulet*).) If grave disability is found, the court appoints a conservator (§ 5350), imposes disabilities on the conservatee as needed (§ 5357), and determines the least restrictive appropriate placement (§ 5358, subd. (a)(1)(A)). The conservatee's home, or that of a relative, is to be given first priority, as an alternative to confinement. (§ 5358, subd. (c)(1).) A conservatorship automatically ends after one year and may be reestablished only by a new petition (§ 5361), subject to the same jury trial rights (see § 5350, subd. (d); *Roulet*, at pp. 225–226; *Baber v. Superior Court* (1980) 113 Cal.App.3d 955, 959).

The court must terminate a conservatorship before the one-year period expires, however, if a progress review determines that "the goals [of treatment] have been reached and the person is no longer gravely disabled." (§ 5352.6, 2d par.) In addition to the right to appeal the judgment imposing conservatorship, conservatees may twice petition for rehearing on their status as a conservatee. (§ 5364.) At such a rehearing, petitioners need only prove by a preponderance of the evidence

that they are no longer gravely disabled. (*John L.*, *supra*, 48 Cal.4th at p. 152.) A conservatee's willingness or ability to accept voluntary treatment is not a basis for rehearing (see § 5364) or for an early conservatorship termination (see § 5352.6).

If a conservatorship is still needed at the end of the one-year term, the conservator may petition for reappointment. (§ 5361.) Such a petition must include the opinion of two physicians, or other described professionals, "that the conservatee is still gravely disabled as a result of mental disorder or impairment by chronic alcoholism." (*Id.*, 1st par.) Section 5361 focuses on grave disability alone and makes no mention of the conservatee's amenability to voluntary treatment. A "reestablishment hearing is conducted according to the same rules that govern the initial establishment of a conservatorship. [Citations.] The state has the burden to prove beyond a reasonable doubt that the conservatee remains gravely disabled." (*Conservatorship of Deidre B.* (2010) 180 Cal.App.4th 1306, 1312; see § 5350, subd. (d)(3).)

B.    *Statutory Analysis*

Reading chapter 3's provisions together, it is clear the Act requires consideration of willingness or ability to accept voluntary treatment only when a professional recommends the *initiation* of conservatorship proceedings for a person who is currently being treated as an inpatient (§ 5352) or is subject to a Probate Code conservatorship (§ 5350.5). Applicable provisions do not mention such a requirement for outpatient recommendations (see § 5352) or for reappointment petitions (see § 5361).

Nor does the Act make amenability to voluntary treatment an issue that must be separately decided at trial. Section 5350 authorizes the court to appoint a conservator "for a person who is gravely disabled as a result of a mental health disorder." (See also § 5361 [authorizing reappointments].) It grants "the right to demand a court or jury trial *on the issue of whether [the subject] is gravely disabled*." (§ 5350, subd. (d)(1), italics added; see also § 5352.1 [temporary conservatorship].) Section 5350 thus expressly limits conservatorship trials to the issue of grave disability. It does not mention whether the proposed conservatee is willing or able to accept treatment voluntarily. This subject is also absent from the statutory definition of "gravely disabled," which considers only whether the "person, as a result of a mental health disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter." (§ 5008, subd. (h)(1)(A); see § 5350, subd. (e)(1).)[9] Read together, sections 5350 and 5008 establish only two requirements for the creation of a conservatorship: (1) The subject has a mental health disorder; and (2) as a result of the disorder, the subject is unable to meet basic survival needs.

The Legislature amended section 5350 in 1989 to clarify that there is no grave disability if a proposed conservatee can survive safely with the assistance of responsible friends, family members, or others willing and able to help meet these basic

---

[9] It should be recalled, however, that those potentially subject to conservatorship will often have been found unwilling or unable to accept treatment by the professional initially recommending conservatorship (§ 5352) and as part of the involuntary detention process (see §§ 5150, subd. (c), 5250, subd. (c), 5270.15, subd. (a)), in which the determination is subject to habeas corpus review (§ 5275).

needs. (See § 5350, subd. (e), as amended by Stats. 1989, ch. 999, § 2, p. 3484.) Notably, the modification did not amend section 5350, or any other provision of the Act, to require separate findings on a person's amenability to voluntary treatment as a prerequisite to imposition of a conservatorship.

Theoretically, someone who is willing and able to accept voluntary treatment may not be gravely disabled if that treatment will allow the person to meet the needs for food, clothing, and shelter. Under the statutory scheme, however, this is an evidentiary conclusion to be drawn by the trier of fact. If credible evidence shows that a proposed conservatee is willing and able to accept treatment that would allow them to meet basic survival needs, the fact finder may conclude a reasonable doubt has been raised on the issue of grave disability, and the effort to impose a conservatorship may fail. It may be necessary in some cases for the fact finder to determine whether the treatment a proposed conservatee is prepared to accept will sufficiently empower them to meet basic survival needs. In some cases of severe dementia or mental illness, there may simply be no treatment that would enable the person to "survive safely in freedom." (*Early, supra,* 35 Cal.3d at p. 255; see *Conservatorship of Symington* (1989) 209 Cal.App.3d 1464, 1467 (*Symington*).)[10] As a practical matter, evidence about amenability to voluntary treatment will generally be in the proposed conservatee's own hands. Placing a burden on

---

[10] K.P. has presented no evidence or argument suggesting he was willing to submit to *inpatient* treatment. Generally, the relevant question in a conservatorship trial is whether the proposed conservatee is able to "survive safely *in freedom,*" either alone or with the willing help of others. (*Early, supra,* 35 Cal.3d at p. 255, italics added.)

counties "to negate all reasonable doubts as to the possible existence of" a treatment the person might voluntarily accept would be counter-productive and potentially contrary to the goals of the Act.  (*Early*, at p. 254.)[11]

Our reading of the statutes is consistent with statements in a number of conservatorship cases observing that the "only" question at trial is whether the proposed conservatee is unable to provide for essential needs due to a mental illness.  (*Roulet, supra,* 23 Cal.3d at p. 232; *Conservatorship of P.D., supra,* 21 Cal.App.5th at p. 1168; see *Conservatorship of Jesse G.* (2016) 248 Cal.App.4th 453, 460–461.)  However, K.P. points to other cases to support a contrary conclusion.  We now address these arguments.

C.    *K.P.'s Argument and Reliance on Contrary Authority*

In support of his position that inability or unwillingness to accept voluntary treatment must be separately proven at trial, K.P. points to a single statutory provision and early cases construing it.  He cites section 5352, which, as noted, requires a professional determination of such inability or unwillingness before the professional recommends conservatorship for a

---

[11]    Similarly, a person who can survive safely with the responsible help of others is not gravely disabled.  If proper evidence of such assistance is presented, the county must prove that the assistance would not enable the proposed conservatee to survive safely without involuntary detention.  But the county's burden on this topic extends only to assistance put at issue by the evidence.  Section 5350, subdivision (e)(2) requires that, "unless they specifically indicate in writing their willingness and ability to help, family, friends, or others shall not be considered willing or able to provide this help."  The mere possibility of assistance from others is not sufficient to defeat a conservatorship.

person receiving inpatient treatment. As explained above, this reliance is misplaced. By its terms, section 5352 speaks only to a professional decision to *recommend* that a conservatorship be established. That recommendation, if accepted, is followed by a structured investigation that may culminate in a trial on grave disability and, if a conservatorship is imposed, on the court's determination whether confinement is necessary.

K.P. relies on two cases from the 1980s that held resistance to voluntary treatment is an additional element that must be proven before conservatorship can be imposed. *Conservatorship of Davis* (1981) 124 Cal.App.3d 313 (*Davis*) was a public guardian's appeal from a finding that the proposed conservatee was not gravely disabled. The trial court had given a special instruction at Davis's request stating, " 'before you may consider whether Mary Davis is gravely disabled you must first find that she is, as a result of a mental disorder, unwilling or unable to accept treatment for that mental disorder on a voluntary basis.' " (*Id*. at p. 319.) It also gave a special instruction directing that the jury could not find Davis gravely disabled if she was capable of surviving safely with the help of willing family members. (*Ibid*.) The Court of Appeal concluded it was not error to give these instructions. (*Id*. at p. 329.) It attempted to harmonize the various conservatorship statutes by concluding that any trial on conservatorship encompassed review of all preceding steps, including initiation (§ 5352) and investigation (§ 5354). "Thus, although section 5350 states that the issue at trial is 'whether [the person] is gravely disabled,' " the court reasoned, "it appears from a reading of the entire act that this phrase must be broadly construed to include the determination of whether the establishment of a conservatorship is necessary in light of all the relevant facts."

(*Davis*, at p. 323.)  Drawing on considerations in sections 5352 and 5354, *Davis* concluded the LPS statutes "necessarily require the trier of fact . . . to determine the question of grave disability, not in a vacuum, but in the context of suitable alternatives, upon a consideration of the willingness and capability of the proposed conservatee to voluntarily accept treatment and upon consideration of whether the nondangerous individual is capable of surviving safely in freedom by himself or with the help of willing and responsible family members, friends or other third parties." (*Davis*, at p. 325.)[12]

Two years later, we approved one of the *Davis* holdings: that grave disability cannot be established if the person can safely survive with the capable assistance of others.  (*Early*, *supra*, 35 Cal.3d 244.)  That holding was consistent with United States Supreme Court precedent that a state " 'cannot constitutionally confine . . . a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends.' " (*Id.* at pp. 251–252, quoting *O'Connor v. Donaldson* (1975) 422 U.S. 563, 576.)

---

[12]  The *Davis* decision was essentially followed in *Conservatorship of Baber* (1984) 153 Cal.App.3d 542, which involved similar instructions.  Although it approved the instructions in principle, however, *Baber* found error in the voluntary assistance instruction's phrasing because it asked only if the proposed conservatee was "unwilling" to accept voluntary treatment, not whether he was " 'unwilling or unable' " to do so. (*Id.* at p. 552, italics omitted.)  Thus, a verdict of no grave disability would have been required if the jury found merely that Baber was willing to accept treatment, even if he were incapable of doing so.  (*Ibid.*)

*Early* concluded this constitutional principle had been incorporated into the LPS Act (*Early*, *supra*, 35 Cal.3d at p. 252) and reasoned that section 5008's definition of grave disability "was intended to encompass a consideration of whether the person could provide these basic needs with or without the assistance of willing and responsible family members, friends, or other third parties." (*Early*, at p. 254.) The principle was later codified by legislative amendment of section 5350. (See § 5350, subd. (e), as amended by Stats. 1989, ch. 999, § 2, p. 3484.) Notably, however, *Early* stopped short of imposing a potentially "insuperable" burden on public guardians "to negate all reasonable doubts as to the possible existence of third party aid." (*Early*, at p. 254.) *Early* held only that the trier of fact "must *consider* the availability of third party assistance" on the issue of grave disability "if credible evidence of such assistance is adduced" at trial, and that an instruction regarding this evidence must be given upon the proposed conservatee's request if the case is tried to a jury. (*Ibid.*, italics added.) Of course, the burden of proof remains on the public guardian. If a proposed conservatee chooses to produce evidence on this topic, the question is whether any such evidence casts the issue of grave disability into reasonable doubt.

*Early* did not address *Davis*'s related holding about a voluntary treatment element. Although the trial court had refused to give an instruction like the one in *Davis*, requiring a finding on voluntary treatment before consideration of grave disability, we did not decide whether that refusal was erroneous because the evidence showed Early had consistently refused treatment for his disorder. (*Early*, *supra*, 35 Cal.3d at pp. 255–256.) Nevertheless, there are parallels between the third party assistance considered in *Early* and acquiescence to voluntary

treatment, in that treatment professionals may provide assistance that enables a person to meet survival needs. As we held with regard to third party assistance in *Early*, evidence of a proposed conservatee's amenability to voluntary treatment is relevant and should generally be admitted for the fact finder's consideration. (See *id.* at p. 254; see also *Davis, supra,* 124 Cal.App.3d at p. 325.) Such evidence will defeat a conservatorship if it raises a reasonable doubt about whether the person is gravely disabled.

K.P. also relies on *Conservatorship of Walker* (1987) 196 Cal.App.3d 1082 (*Walker*). There, the jury was instructed: " 'If you find that John Thomas Walker can survive safely in freedom by himself or with the help of this available, willing and responsible family member, friend or other third party and that John Thomas Walker is willing and capable of accepting voluntary treatment, then you must find that John Thomas Walker is not gravely disabled.' " (*Id.* at p. 1091, italics omitted.) The Court of Appeal found fault with this instruction. (*Id.* at p. 1092.) Relying on section 5352 and *Davis,* it held that a conservatorship may be established only upon proof of *both* grave disability, as defined in section 5008, and unwillingness or inability to accept voluntary treatment. (*Walker*, at pp. 1092–1093.) Because *Davis* established that a "proposed conservatee has the right to have a jury determine all the issues relevant to the establishment of the conservatorship" (*Walker*, at p. 1092, citing *Davis, supra,* 124 Cal.App.3d at p. 324), the court reasoned: "The jury should determine if the person voluntarily accepts meaningful treatment, in which case no conservatorship is necessary. If the jury finds the person will not accept treatment, then it must determine if the person can meet his basic needs on his own or with help, in which case a

conservatorship is not justified." (*Walker*, at pp. 1092–1093.) Because the instruction at issue allowed Walker's jury to reject conservatorship only if it found that Walker was *both* capable of meeting his basic needs *and* willing and able to accept voluntary treatment, the court held it was erroneous. (*Id*. at p. 1093.)

As K.P. acknowledges, other cases have declined to follow *Davis* and *Walker*. The first, *Symington, supra*, 209 Cal.App.3d 1464, involved a bench trial. The trial court found the proposed conservatee gravely disabled and observed that it was unnecessary to decide in addition whether she was willing or able to accept voluntary treatment. (*Id*. at p. 1466.) Symington challenged the absence of this finding on appeal, asserting that grave disability " '*by definition* includes an unwillingness and/or inability on the part of the proposed conservatee to voluntarily accept treatment for the mental disorder . . . .' " (*Id*. at p. 1467.) The Court of Appeal expressed doubt that a finding of unwillingness or inability to accept treatment was required, explaining that this language is not found elsewhere in the conservatorship statutes but only in section 5352, a provision "apparently designed to allow treatment facilities to initiate conservatorship proceedings at the time a patient is accepted where the individual may prove uncooperative. It appears to have been enacted for that limited purpose, not as an additional element to be proved to establish the conservatorship itself." (*Symington*, at p. 1467.) The court concluded section 5352's reference to unwillingness or inability to accept voluntary treatment "is not intended to be a legal term, but is a standard by which mental health professionals determine whether a conservatorship is necessary." (*Symington*, at p. 1468.) Sensitive to the facts of the case before it, which involved an octogenarian with severe intellectual and memory impairment

from senile dementia (*id.* at p. 1466), the court observed that "many gravely disabled individuals are simply beyond treatment. Under the interpretation of the statutory scheme urged upon us, they presumably could not be the subject of an LPS Act conservatorship at all." (*Id.* at p. 1467.)

The issue did not resurface for 30 years, until K.P.'s appeal here and *Conservatorship of D.P.* (2019) 41 Cal.App.5th 794, review granted and held February 11, 2020. In both cases, the juries were given a version of CACI No. 4000 that did not include unwillingness or inability to accept voluntary treatment as a required element for conservatorship. (*D.P.*, at p. 799; *Conservatorship of K.P., supra,* 39 Cal.App.5th at p. 263.)[13] However, both juries were also given a modified version of CACI No. 4002, which explained that they could consider willingness or ability to accept voluntary treatment in deciding whether the proposed conservatees were gravely disabled. (*D.P.*, at p. 799; *K.P.*, at p. 263.) On appeal, the courts determined these instructions accurately reflected the law. The court here found *Symington*'s reasoning persuasive and agreed that section 5352 does not require additional proof. (*K.P.*, at p. 268.) The Court of Appeal in *D.P.* also agreed with *Symington*'s statutory analysis. (*D.P.*, at pp. 802–803.) It further noted that section 5352 does not apply to reappointment petitions, and the applicable statute requires only a finding that the person " '*remains* gravely disabled.' " (*D.P.*, at p. 804; see § 5352.)

---

[13] The Judicial Council's form instruction for CACI No. 4000 includes this requirement in brackets. A use note explains, with citations to *Symington, supra,* 209 Cal.App.3d at page 1467 and *Davis, supra,* 124 Cal.App.3d at page 328, that "[t]here is a split of authority as to whether element 3 is required." (Use Note to CACI No. 4000 (2020) p. 976.)

Thus, even if a finding about amenability to voluntary treatment were required in the initial appointment of a conservator, there was no statutory basis for imposing it in reappointment proceedings. (*D.P.*, at pp. 803–804.)

We agree with these recent decisions that *Davis* and *Walker* are not persuasive as to the role that acceptance of voluntary treatment appropriately plays in a conservatorship trial. As in *Early*, *Davis* was partially correct to the extent it held a trier of fact may *consider* a proposed conservatee's openness to treatment when evaluating whether the constraints of conservatorship are necessary under all attendant circumstances. Naturally, a trier of fact can consider all relevant evidence, which is defined as that "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Evidence that a person is willing and able to accept meaningful treatment is certainly relevant to the ultimate question whether a conservatorship is necessary. But there is a difference between relevant evidence and the elements that must be proven to determine an action. In a conservatorship trial, the only *elements* that must be proven are that the person (1) suffers from a mental health disorder that (2) renders him or her gravely disabled. (Welf. & Inst. Code, § 5350.) Evidence bearing on the person's ability and willingness to accept treatment may assist the fact finder in resolving that question. But such willingness is neither an element that must be proven nor itself dispositive of the issue of grave disability.[14]

---

[14] In this way, amenability to treatment is similar to the role of motive in a homicide trial. Motive is not an element of any homicide offense; however, evidence of motive may be relevant

Particularly for those suffering from mental illness, openness to treatment may not be a fixed status. It may wax and wane depending on many variables, including medication status and the particulars of housing status or confinement. Evidence on the topic may also be disputed, or of varying degrees of persuasiveness. *Early*'s caution against imposing on public guardians the insuperable burden of disproving a negative is equally applicable here. (See *Early, supra,* 35 Cal.3d at p. 254.)

Thus, the *Davis* decision went too far to the extent it called for proof of an additional element not found in the statutory definition. Courts may not expand statutory language under the guise of interpretation. (*In re Miller* (1947) 31 Cal.2d 191, 199; see Code Civ. Proc., § 1858.) The *Walker* court strayed even further afield from the statutory framework. It endorsed a two-step procedure under which a jury would not even consider the issue of grave disability if it concluded the proposed conservatee was willing and able to accept treatment. (See *Walker, supra,* 196 Cal.App.3d at pp. 1092–1093.) These cases did not have the benefit of the Legislature's 1989 amendment of section 5350, which codified the holdings in *Davis* and *Early* on third party assistance but did not embrace the additional expansion *Davis* suggested for amenability to voluntary treatment. They also upset the carefully calibrated statutory approach through which the Legislature has endeavored to protect both the mentally ill and the public, and to ensure that those in need can receive prompt, appropriate treatment tailored to their individual condition and circumstances. *Conservatorship of Davis, supra,* 124 Cal.App.3d 313, *Conservatorship of Walker, supra,* 196

---

to show the offender's mental state, which is a required element. (See *People v. Smith* (2005) 37 Cal.4th 733, 740–742.)

Cal.App.3d 1082, and *Conservatorship of Baber*, *supra*, 153 Cal.App.3d 542 are therefore disapproved to the extent they are inconsistent with the decision here.

D. *Due Process*

Finally, even assuming the LPS Act does not require it, K.P. contends state and federal due process principles prohibit the appointment of a conservator unless the state can prove beyond a reasonable doubt that the conservatee is unwilling or unable to accept treatment voluntarily.

"The liberty interests at stake in a conservatorship proceeding are significant." (*Ben C.*, *supra*, 40 Cal.4th at p. 540; see *Roulet*, *supra*, 23 Cal.3d at p. 228.) A conservatorship can result in involuntary confinement, which " ' "entails a 'massive curtailment of liberty' in the constitutional sense." ' " (*Roulet*, at p. 224.) A person found gravely disabled also faces stigmatization and the loss of personal rights like the freedom to drive, vote, enter contracts, and decide about medical treatment. (See *Ben C.*, at p. 540; *John L.*, *supra*, 48 Cal.4th at p. 150; see also § 5357.) This potential deprivation of liberty implicates due process concerns.

K.P. contends, "limiting the jury's consideration to the sole issue of grave disability as defined by the statute would seriously infringe on the conservatee's due process rights." His argument takes an unduly narrow view of what "grave disability" means in a conservatorship trial. We agree that that the fact finder must be allowed to consider all credible evidence bearing on the issue of grave disability, including whether the person is capable of receiving voluntary treatment. A conservatorship is not be necessary if the mentally ill person is willing and able to accept specified, available treatment that

will enable the person to survive safely without involuntary detention. (See §§ 5008, 5350, subd. (e)(1).) The fact finder should be able to evaluate competent evidence of the person's amenability to voluntary treatment, and a jury should receive appropriate instructions on how the evidence should be considered. But the question here is not just whether the fact finder may consider evidence; it is whether due process requires that the state prove a proposed conservatee's resistance to voluntary treatment as a separate element. We are not persuaded that the federal or state Constitutions require a separate finding on the voluntary treatment issue.

K.P. has not explained why a proposed conservatee's constitutional rights are not sufficiently protected by the fact finder's consideration of amenability to voluntary treatment in connection with grave disability, or why the state must instead be tasked with proving this issue separately. We have previously declined to create such a new requirement. *Early* held that a person who can provide for basic survival needs with assistance from others is not gravely disabled. This holding was constitutionally required under United States Supreme Court precedent. (See *Early*, *supra*, 35 Cal.3d at pp. 251–252, citing *O'Connor v. Donaldson*, *supra*, 422 U.S. at p. 576.) Yet, though *Early* concluded evidence of third party assistance could be considered by the fact finder when offered, it also observed that "the burden of proving grave disability [as statutorily] defined could well become insuperable if those alleging such disability had to negate all reasonable doubts as to the possible existence of third party aid." (*Early*, at p. 254.)

Similar to third party assistance, the fact finder may conclude there is no grave disability if a person is both willing and able to accept treatment that will ensure basic survival

needs are met. Amenability to voluntary treatment is thus relevant to the ultimate question of grave disability. As in *Early*, we conclude evidence on the voluntary treatment issue is admissible for the fact finder's consideration. But the Legislature has not made resistance to voluntary treatment a separate element to be proven by the state, nor does any constitutional precedent require that it do so. It has long been held that the gravely disabled standard is constitutionally sufficient to justify the imposition of a conservatorship. (*Conservatorship of Chambers* (1977) 71 Cal.App.3d 277, 285.) K.P. has not demonstrated that more is required.

E.    *Application*

At the trial below, both the Public Guardian and K.P. presented evidence about K.P.'s willingness and ability to accept voluntary treatment. A psychologist explained that K.P.'s lack of insight into his schizophrenia would hinder his ability to continue with medications and therapy on a voluntary basis. The psychologist believed K.P. needed a conservator's supervision to ensure he would take his medications consistently and correctly. K.P. confirmed this assessment when he testified. He denied having a mental illness and admitted he would not continue taking his medications if released from conservatorship.

The court also gave appropriate instructions on how this evidence could be considered. After instructing on the Public Guardian's obligation to prove that K.P. had a mental disorder and was gravely disabled as a result (CACI No. 4000), the court gave a modified version of CACI No. 4002 that specifically referenced K.P.'s willingness and ability to accept voluntary treatment. Because evidence on amenability to voluntary

treatment was properly admitted, and the jury was properly instructed on its relevance, there was no error. The jury's finding of grave disability was sufficient to appoint a conservator.

## III. DISPOSITION

The judgment is affirmed.

**CORRIGAN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Conservatorship of K.P.

---

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 39 Cal.App.5th 254
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S258212
**Date Filed:** June 28, 2021

---

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Robert S. Harrison

---

**Counsel:**

Christopher L. Haberman, under appointment by the Supreme Court, and Christian C. Buckley, under appointment by the Court of Appeal, for Objector and Appellant.

Mary C. Wickham, County Counsel, Rosanne Wong and Joyce M. Aiello, Assistant County Counsel, Jose Silva, Principal Deputy County Counsel, and William C. Sias, Deputy County Counsel, for Petitioner and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Christopher L. Haberman
Attorney at Law
P.O. Box 521
Visalia, CA 93279
(559) 384-0703

William C. Sias
Deputy County Counsel
500 West Temple St., Suite 648
Los Angeles, CA 90012
(213) 407-4947