Filed 7/15/24  Public Guardian v. K.H. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| PUBLIC GUARDIAN OF SONOMA COUNTY,<br>　　　Plaintiff and Respondent,<br>v.<br>K.H.,<br>　　　Defendant and Appellant. | A169186<br><br>(Sonoma County Super. Ct. No. SPR095855) |

K.H. appeals from the trial court's order appointing the Sonoma County Public Guardian (public guardian) conservator of her person pursuant to section 5350 of the Lanterman-Petris-Short Act (Welf. & Inst. Code,[1] § 5000, et seq.; LPS Act).  On appeal, she contends she was entitled to an interpreter at her competency evaluation.  We disagree and affirm the order.

### BACKGROUND

K.H. has been under conservatorship since 2021.  Because her pending conservatorship was set to expire, the public guardian filed a petition to "reestablish" conservatorship for an additional year.  The petition asserted K.H. "is still gravely disabled as a result of a mental disorder," and attached the opinions of Frederick Stoddard, M.D., a psychiatrist, and Artoleles Tandinco, M.D., a physician.  Dr. Stoddard's declaration stated K.H. was under his care, he examined K.H. in advance of the petition, and he

---

[1] All further statutory references are to the Welfare & Institutions Code.

concluded K.H. was then suffering from "Schizoaffective Disorder Bipolar Type." He noted she was confused, disoriented, and unable to care for herself. Specifically, Dr. Stoddard stated K.H. "needs encouragement to bathe and take medications" and does not believe she needs medication. He emphasized she "would NOT take [medications] if she were not in the hospital." Dr. Stoddard further noted K.H. "remains psychotic and internally preoccupied," is "paranoid and delusional that people are touching her or harassing her," and yells and blames staff "for things that never happened." He recommended K.H. be placed in an institution for mental disease (IMD) locked facility.

Dr. Tandinco concurred with the diagnosis and opinion set forth in Dr. Stoddard's declaration based on his review of K.H.'s medical records. Dr. Tandinco also recommended K.H. be placed in an IMD locked facility.

The court subsequently held a one-day bench trial. A Korean language interpreter was present during the proceedings.

Dr. Gary Bravo, an expert in psychiatry, gave the following testimony regarding K.H.'s mental condition. He had conducted three evaluations of K.H. "for court purposes" over the past three years and reviewed her medical records. The evaluations were all conducted in English. The first two evaluations took approximately 10-15 minutes each and the final evaluation, undertaken earlier the same day he testified, took approximately 15 minutes.

Dr. Bravo's most recent evaluation was in preparation for the current competency hearing. Prior to that evaluation, Dr. Bravo spoke with K.H.'s case manager, her outpatient case manager, and her psychiatrist; based on those discussions, it was his understanding that staff at her current placement reported K.H. "understands enough English and . . . speaks English well enough to communicate clearly." Dr. Bravo acknowledged K.H.

2

speaks with a heavy accent that can be hard to understand but he understood enough to make his evaluation and reach his conclusions. He was "able to understand her quite well" during the prior two interviews but during the recent interview, "it was a lot harder to understand" K.H. because of her "very rapid, very pressured and very difficult to interrupt" speech. Nonetheless, at the most recent interview he was able to ask specific questions and get answers to those questions; K.H. appeared to understand him because she responded with narrative answers responsive to the questions asked.

During the evaluation, Dr. Bravo asked K.H. about her plans for obtaining food, clothing, and shelter if not subject to conservatorship. K.H. stated she "wanted a home that was worth either $50 million or $20 million" but would "need help" getting the house. She did not provide any other details.

Based on his evaluations and review, Dr. Bravo opined K.H. suffered from "[s]chizoaffective disorder bipolar type," evidenced by "paranoid delusions," "disorganized behavior," and "denial of illness." He concluded she was gravely disabled because she "is in denial of her condition," "responds to severe paranoid delusions" that "cause[] her to have outbursts against her peers and caretakers," and "does not want to move from [her current placement] yet she doesn't want to be there and doesn't want to consider other placements." While Dr. Bravo acknowledged paranoia could arise from cultural or linguistical misunderstandings, he noted "I don't think that's the case in this case." He explained K.H. "is very paranoid about her roommates. She thinks she will be killed if she moves to another facility. She loses control of her temper and seriously verbally abuses staff and peers. She says . . . she will not go to groups because she's afraid of being raped. . . . When I

3

talked to her today part of what was hard to understand . . . was not the language but the rapid pressured flow of speech that came from her. It was a repetitive, angry, delusional tirade against her roommate and others in the facility and not much of a dialogue."

Following the trial, the court noted it took into consideration "the questions about [K.H.'s] ability to understand the nature of the process, but also to be able to understand interacting with Dr. Bravo in her non primary language of English." The court focused on Dr. Bravo's testimony that (1) he could understand her "quite well" at two prior interviews, (2) despite more difficulty understanding K.H. at her recent evaluation due to "rushed or very rapid speech," Dr. Bravo "concluded he could understand [K.H.] sufficiently to make his medical conclusion," and (3) he "described in detail" K.H.'s concerns, such as involving group sessions and her roommates. The court further noted K.H. was able to appropriately respond to the court's directions and communications. The court thus determined Dr. Bravo's evaluation of K.H., despite English not being K.H.'s first language, provided a sufficient basis for him to draw his medical conclusions. Based on the documentary evidence and Dr. Bravo's testimony, the court found K.H. gravely disabled. K.H. timely appealed.

## DISCUSSION

K.H. contends the court violated her due process rights by failing to order that she be evaluated in her native language. She also asserts substantial evidence does not support the conservatorship or the failure to order use of an interpreter.

## I. Due Process Rights

K.H. acknowledges she "has discovered no caselaw or statutory authority providing for when an interpreter is required in the evaluation of a

4

conservatee under the LPS Act." Nor are we aware of any. Instead, K.H. asserts we should analogize her conservatorship proceeding to criminal proceedings because both proceedings involve due process rights. We need not address whether an individual's right to an interpreter in a criminal context should apply in a conservatorship as, even assuming such rights apply, K.H.'s argument fails.

In the criminal context, Article I, section 14 of the California Constitution protects a defendant's right to an interpreter "throughout the proceedings." Courts have emphasized the importance of interpreters because a defendant who cannot understand the proceedings or communicate with his trial counsel cannot be "truly present at his trial" and "is ipso facto denied effective representation." (*People v. Aranda* (1986) 186 Cal.App.3d 230, 236, fn. omitted.) This right to interpreters safeguards the constitutional rights of non-English-speaking defendants "to due process, to confrontation, to effective assistance of counsel, and to be present at trial." (*People v. Rodriguez* (1986) 42 Cal.3d 1005, 1011.)

K.H. does not dispute the adequacy of the bench trial. A Korean language interpreter was present throughout those proceedings, and she has not identified any error associated with that interpreter or the trial proceedings. Instead, she asserts an interpreter should have been provided at the competency evaluation. But even assuming so, "[i]mproper procedures in the use of an interpreter do not rise to the level of a constitutional violation unless they result in prejudice demonstrating defendant was denied his right to a fair trial." (*People v. Superior Court (Almaraz)* (2001) 89 Cal.App.4th 1353, 1360.) K.H. has not identified any such prejudice. Her counsel cross-examined Dr. Bravo, including questioning the adequacy of his evaluation considering the alleged linguistic barrier. K.H. had the opportunity to testify

5

with an interpreter regarding any confusion that may have arisen during the competency evaluation, but she declined to do so. She also had the opportunity to present her own witnesses who could testify as to her language skills and/or competency.

Accordingly, K.H. has failed to demonstrate she was denied a fair trial and we conclude K.H. was not denied any due process rights based on the absence of an interpreter at the competency evaluation.

## II. Substantial Evidence

Next, K.H. asserts substantial evidence did not support the court's determination that translation services were not required for her competency evaluation. She relies on *People v. Aguilar* (1984) 35 Cal.3d 785 (*Aguilar*) to argue the evidence demonstrated an interpreter was necessary.[2]

As an initial matter, we note the record does not indicate K.H. filed any objection or other challenge to the admissibility of the competency evaluation. Likewise, K.H. does not appear to have raised with the trial court whether an interpreter was needed for her competency evaluation and the trial court did not issue any rulings or orders regarding whether translation services were or were not required for her evaluation. Rather, the court considered K.H.'s ability to communicate and understand English in assessing whether Dr. Bravo's testimony and evaluation supported a finding of grave disability.

" '[T]o establish that a person is gravely disabled, the evidence must support an objective finding that the person, due to mental disorder, is incapacitated or rendered unable to carry out the transactions necessary for

---

[2] While K.H. discusses "*Aguilar* factors," that case does not identify specific factors courts should consider when assessing whether a defendant requires a translator. Instead, the opinion discusses whether the evidence in that case demonstrated any English fluency. (*Aguilar*, *supra*, 35 Cal.3d at p. 789, fn. 4.)

survival or otherwise provide for his or her basic needs of food, clothing, or shelter,' and the public guardian must prove beyond a reasonable doubt that the proposed conservatee is gravely disabled. [Citation.] On appeal, we apply the substantial evidence test to determine whether the record supports the court's finding of grave disability. The testimony of one witness may be sufficient to support such a finding." (*Conservatorship of Jesse G.* (2016) 248 Cal.App.4th 453, 460–461.)

Here, substantial evidence supports the court's finding. Dr. Bravo testified regarding K.H.'s ability to meet her "basic needs of food, clothing, or shelter." (See *ibid.*) During the evaluation he asked about her plan for meeting such needs. In response, K.H. stated she needed a $20 million or $50 million home and would need assistance obtaining it. She did not articulate any reasonable housing option for herself or identify how she would meet other basic needs apart from shelter. Instead, much of the evaluation appeared to consist of a one-way paranoid dialogue by K.H. against her roommate and others at the facility, while also claiming she would be murdered or harmed if she moved to a different facility. The record also contains a declaration by her treating psychiatrist at the facility, Dr. Stoddard, who described similar conduct, noted K.H. "needs encouragement to bathe and take medications," and emphasized K.H. would not take her medication if not hospitalized. These statements are supported by K.H.'s comments during the hearing denying any mental illness. When Dr. Bravo was asked about the adequacy of his conclusions based on his ability to communicate with K.H., he stated he had conducted all his evaluations with her in English, and he was sufficiently able to understand her to reach his conclusions. He further stated he believed she understood his questions

because she provided specific information that was responsive to his questions.

K.H.'s arguments regarding an interpreter do not undermine the adequacy of this evidence. First, K.H. asserts Dr. Bravo "was not particularly familiar with Korean culture," and paranoia "could arise from cultural misunderstanding." But Dr. Bravo explained K.H.'s specific paranoid delusions regarding being killed by her roommates, being raped if she attended groups, and being murdered or harmed if she moved facilities did not appear related to cultural issues.

Next, K.H. asserts it "appears" she found the interaction with Dr. Bravo "frustrating and irritating," which "may be a result of misunderstanding or difficulty communicating." But nothing in the record indicates she was frustrated or irritated at Dr. Bravo. Rather, Dr. Bravo described her angry speech as being "against her roommate and others in the facility."

Finally, K.H. claims "the anger that [Dr.] Bravo observed and that the staff reported on may have had the same foundation in linguistic and cultural misunderstanding." K.H. appears to be merely speculating and cites no evidence in the record to support her position. Moreover, as noted above and explained by Dr. Bravo, the specific claims asserted by K.H. against her roommate, others at the facility, and other facilities generally suggest her conduct did not arise merely from a linguistic or cultural misunderstanding.

Based on the foregoing, substantial evidence supports the trial court's finding of grave disability.

## DISPOSITION

The order is affirmed.

_____
Petrou, J.

WE CONCUR:

_____
Tucher, P.J.

_____
Rodríguez, J.

A169186/*Public Guardian of Sonoma County v. K.H.*